**CUTLER–HAMMER, INCORPORATED et al.,**

v.

**The UNITED STATES.**

**No. 531–69.**

United States Court of Claims.

May 14, 1971.

Albert H. Greene, Washington, D. C., attorney of record for plaintiffs; Richard J. Ney, and Alvord & Alvord, Washington, D. C., of counsel.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFFS' MOTION AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge:

This case is before us on plaintiffs' motion and defendant's cross motion for summary judgment. Plaintiffs are seven domestic corporations, all industrial users of silver. The cause of action is based upon an alleged breach by the defendant of an alleged contract to sell silver to the plaintiffs at the price of $1.-292929292 ($1.29+) per fine troy ounce. Jurisdiction is said to lie under 28 U.S.C. § 1491.

The facts of this case present an interesting bit of monetary history, even though contributing no new problem to the field of contract law. We hold that plaintiffs have no actionable claim because their allegations do not set forth any facts which support the existence of a contract, either express or implied.

Both sides have filed lengthy motions, affidavits, documents, and briefs setting forth the background facts in great detail. We have examined this material carefully, but find it unnecessary to do more than summarize it here, since there is no factual dispute and the only question for resolution is whether the Treasury Department Regulation of May 18, 1967, 32 Fed.Reg. 7496, was contractual in nature, an offer binding the United States to sell silver to anyone who complied with its terms. The Regulation reads in part as follows:

§ 56.1 Conditions upon which silver will be sold.

An application for the purchase of silver may be filed either with the Federal Reserve Bank of New York or the Federal Reserve Bank of San Francisco on forms which are available at both Banks and at the Offices of the Directors of the Mint and of Domestic Gold and Silver Operations. The right is reserved to supply the silver from any mint institution as the interest of the Government requires. Silver may be sold only in amounts required for domestic manufacturing use in the normal conduct of the applicant's business. The applicant is required to certify that the amount of silver which he desires to purchase, together with that on hand, will not exceed his normal requirements for a 2-month period, and that the silver is for manufacturing uses. Applications for unusual amounts of silver are required to be referred to the Office of the Director of Domestic Gold and Silver Operations for approval before the sale can be made.

§ 56.2 Sales price.

Silver is sold at a price not less than $1.292929292 per fine troy ounce. Transportation charges from the mint institution to the purchaser are paid by the purchaser. Payment shall be made in a form acceptable to the Federal Reserve Bank.

\* \* \* \* \* \*

This regulation was issued pursuant to § 209 of the Coinage Act of 1965, 31 U.S.C. § 405a–1 (Supp. V, 1965–69). The purpose of the Act was "to conserve this Nation's rapidly dwindling supply of silver", H.R.Rep.No.509, 89th Cong., 1st Sess. (1965), U.S.Code Cong. & Admin.News 1965, p. 2299, by eliminating the use of silver in all coins except the silver dollar. It authorized the minting of the now familiar clad or "sandwich" coin consisting of a copper core between layers of cupro-nickel to replace the silver coins of lesser denomination. H.R. Rep.No.509 gives us the background for this legislation:

The tremendous expansion in the demand for silver coupled with the relatively static supply, and the importance of silver in industrial processes, such as photography, where no

satisfactory substitute exists, have been responsible for a dramatic increase in the market price of silver over a period of only 4 years. Prior to 1962, the New York price of silver bullion had not reached or exceeded a dollar per fine troy ounce in more than 40 years. It was relatively stable in price from 1951 through most of 1961 in the neighborhood of 91 cents an ounce. Since late 1961 it has risen sharply to the monetary value of silver as used in the standard silver dollar. (Footnote omitted.)

The price of silver has been held at $1.29 because the Treasury Department stands ready to redeem outstanding silver certificates at the monetary value of silver. The effect is that the Treasury Department has become the residual supplier to the market of the silver needed to make up the difference between consumption and production. U.S.Code Cong. & Admin.News 1965, p. 2302.

The value of the silver content in a silver dollar as money has, since 1792, been $1.29+ per fine troy ounce, i. e., when the market price of silver reached $1.29+, the silver in the silver dollars became worth 100 cents. If the market price of silver exceeded that figure, it would become profitable to melt down coins for their silver content. The fear was that rising silver prices would promote hoarding or melting of silver coins before enough of the new clad coins could be minted to meet the needs of our economy. In order to remove this threat to the existing coinage, the Secretary of the Treasury was authorized by § 209 of the Act "to sell on such terms and conditions as he may deem appropriate, at a price not less than the monetary value of $1.292929292 per fine troy ounce, any silver of the United States in excess of that required to be held as reserves against outstanding silver certificates". Initially this "free" silver was sold at that price to all comers and it achieved the desired effect of holding down the price. The drain on the Treasury's supply of free silver was

tremendous, however, and it became necessary to issue the Regulation of May 18, 1967, *supra*, limiting sales to domestic industrial users and only in the quantities expressed therein. Treasury Department Release of May 18, 1967, (plaintiffs' exhibit E) explained:

These actions have become necessary because of a rapid increase in the amounts of purchases of silver held by the Treasury. These purchases have been rising at an unprecedented rate during the past week and, if unchecked, could lead to exhaustion of the silver supplies which the Treasury is authorized to sell. This, in turn could result in excessive hoarding of silver coins needed in our national economy at present, as well as in disorderly, speculative dealings in silver affecting the United States economy.

Applications of industrial users were required to be submitted on Form TS–400, which was labeled: APPLICATION AND END-USE CERTIFICATE FOR SILVER BULLION TO BE USED IN DOMESTIC MANUFACTURING OPERATIONS. The form listed the name of the purchaser, the amount of silver requested and made the certifications required by the Regulation, *supra*. Due to the large amount of silver sold under this procedure during the first three weeks, the Department required that *all* applications received thereafter be referred to the Office of Domestic Gold and Silver Operations for prior approval. Mr. Thomas W. Wolfe, who is the Director, has furnished the defendant an affidavit showing the scope of this business, (defendant's exhibit 7A):

* * * the decision to refer such applications to the Office of Domestic Gold and Silver Operations was based on the fact that after about three weeks, approximately 19 million ounces of silver had been sold under the End-Use Certificate procedure. This was considered unusual when compared with normal U. S. consumption over the period which, based on a yearly figure of 150 million ounces,

the Treasury estimated at not more than 12,500,000 ounces.

When one of the Federal Reserve Banks received an application, it made acknowledgement in the following manner:

This will acknowledge the receipt of your Application and End-Use Certificate dated for approximately ounces of silver bullion which we have forwarded to the United States Assay Office in New York. When we have been informed of the decision of the United States Assay Office in regard to such application we will inform you accordingly.

Pursuant to this procedure, plaintiffs filed applications for and were allowed to purchase varying quantities of silver at the price of $1.29+.

On July 14, 1967, pursuant to a recommendation of the Joint Commission on the Coinage, the Treasury halted the sale of silver at the $1.29+ price and announced that future sales would be conducted by the General Services Administration under a competitive bid procedure. This was because it had minted sufficient clad coins to meet the needs of the economy and it was no longer considered necessary to hold down the price of silver by means of these sales. The only orders filled thereafter were those where the applicant had been advised of approval and the amount had been set aside for him.

Between June 30 and July 13, 1967 plaintiffs had filed a total of twenty applications for silver totalling 7,734,000 ounces, and had received acknowledgements in the form referred to above. But in no case had any of the plaintiffs received any notification that the applications had been approved. It is the failure of the Treasury to fill the orders contained in these applications which plaintiffs contend constitutes a breach of contract. They seek damages in the total amount of $3,798,870. The argument is that the Regulation of May 18, 1967, was an offer which plaintiffs accepted by filing Forms TS–400. As an alternative argument plaintiffs urge

that the filing of the Forms TS–400 constituted the offer which defendant accepted by its acknowledgement of receipt.

In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention. National By-Products, Inc. v. United States, 405 F.2d 1256, 1264, 186 Ct.Cl. 546, 560 (1969). We find nothing in the language of the Regulation or the acknowledgement which could be construed as contractual in nature, by that standard. That is, nowhere is there a *promise* on the part of the Government to sell even one ounce of silver at the price mentioned. Purchasers are simply invited to make "application" to buy certain quantities of silver at a price which will be *not less than* $1.29+. This reference to price in terms of a minimum rather than a maximum should put any one on guard that there was nothing firm in the quotation. These applications were in turn subject to the approval of the Director of Domestic Gold and Silver Operations, the reason apparently being for him to determine that each applicant was in fact requesting no more than an amount which "together with that on hand, will not exceed his normal requirements for a 2-month period". Providing that the application be subject to such approval is alone sufficient to negate existence of a contract until the approval is granted. As said in 1 Corbin on Contracts § 11 at 25 (1963):

\* \* \*. So long as it is reasonably apparent that some further act of the offeror is necessary, the offeree has no power to create contractual relations by an act of his own, and there is as yet no operative offer.

Even if the language could otherwise be given such a meaning, the requisite approval "was a condition precedent to the formation of any binding contracts". D. C. Andrews & Co. v. United States, 292 F.2d 280, 283, 154 Ct.Cl. 460, 465 (1961). Sec. 24 of the Restatement Sec-

ond, Contracts, Tentative Draft No. 1 (1964), defines an offer:

> An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.

It requires a distortion of plain English to infer that making an application in conformity with the terms of this Regulation would constitute an acceptance of an offer whereby the United States intended to bind itself.

Plaintiffs have cited us to several prior cases of this court wherein agency regulations, to use the language of plaintiffs' counsel, "have been deemed offers which ripened into contracts upon acceptance by those members of the public to which the offer was directed". In Radium Mines, Inc. v. United States, 153 F.Supp. 403, 404–405, 139 Ct.Cl. 144, 146–147 (1957), the pertinent Regulation was entitled "Ten Year Guaranteed Minimum Price", and began:

> (a) *Guarantee.* To stimulate domestic production of uranium and in the interest of the common defense and security the United States Atomic Energy Commission hereby establishes the guaranteed minimum prices specified in paragraph (b) of this section, for the delivery to the Commission, in accordance with the terms of this section during the ten calendar years following its effective date * * *, of domestic refined uranium, high-grade uranium-bearing ores and mechanical concentrates, in not less than the quantity and grade specified in paragraph (e) of this section. * * *
>
> * * * * * *
>
> (d) *Purchase Contract.* Upon receipt of an offer and sample, an analysis of the sample will be made. If the sample and the information furnished are determined by the Commission to meet the conditions of this section, the Commission will forward to the person making the offer a form of contract containing applicable terms and conditions ready for his acceptance. * * *

We rejected the contention of the Government there that the Regulation was not an offer "but a mere invitation to the industry * * *, which the Government could then accept or reject as it saw fit". 153 F.Supp. at 405, 139 Ct.Cl. at 147. We found that the purpose was to induce persons to find and mine uranium and that such *actual performance in reliance thereon* was sufficient to complete the contract. There was similar reasoning in New York Airways v. United States, 369 F.2d 743, 751, 177 Ct.Cl. 800, 816 (1966) where we held:

> The actions of the parties support the existence of a contract at least implied in fact. The Board's rate order was, in substance, an offer by the Government to pay the plaintiffs a stipulated compensation for the transportation of mail, and *the actual transportation of the mail was the plaintiffs' acceptance of that offer.* * * *. (Emphasis supplied.)

The emphasized language points up the difference between the cases relied on by the plaintiffs and the one at bar. Here the Government by any interpretation was not making an offer to be accepted by performance. Plaintiffs were simply the incidental beneficiaries of a Government policy, the purpose of which was to protect the coinage, not to provide windfall profits to silver buyers. *Cf.,* Rough Diamond Co. v. United States, 351 F.2d 636, 173 Ct.Cl. 15 (1965), *cert. denied,* 383 U.S. 957, 86 S. Ct. 1221, 16 L.Ed.2d 300 (1966). The plaintiff in *Radium Mines, supra,* was an intended beneficiary of the policy, proclaimed in that Regulation, "to stimulate domestic production of uranium". In reliance on that policy, the plaintiff expended considerable time, money and effort to extract uranium, the only market for which was the Government. But such is not this case. The only effort to be expended by these plaintiffs was to fill in the blanks of a Government prepared form. They were not invited to accept by performance.

Everything we have said applies with equal force to the "acknowledgements" furnished to the plaintiffs by the Federal Reserve Banks. Even assuming that by filing an application on Form TS–400, the plaintiffs had made an "offer" in the contractual sense, there is no possible way to interpret the language of the acknowledgement as an "acceptance" of that offer. This document simply acknowledges receipt of the application and informs that it has been forwarded to the United States Assay Office for approval. The concluding sentence is "when we have been informed of the decision of the United States Assay Office in regard to such application we will inform you accordingly". Such language is not even a conditional acceptance. On the contrary, the only reasonable inference to be drawn is that the drafter of this document considered himself to be without authority to approve the applications or to accept an offer. It clearly contemplates action by the Assay Office at some future time. Whether this case would be different if these plaintiffs had been notified that their applications were approved we do not speculate. The issue will not arise because all such orders were in fact filled. Regarding the applications sued on here, in no instance was one of these plaintiffs given notification of approval.

■ Plaintiffs' theory, as we understand it is this: conceding *arguendo* that the words of the Regulation are not those of a contract offer, they say these words take on a special meaning in light of the attendant circumstances and the purposes the Treasury sought to further. The Regulation, they say, was useless, unless it was believed in by the trade as a binding commitment to supply the wants of domestic users at a price not over the monetary value of the silver. Otherwise, silver prices would continue to rise notwithstanding, and coins would disappear from circulation for hoarding or melting. We accept this analysis as valid and assume that the regulation must have had this credibility during its life, or it would have been a failure. Plaintiffs omit to carry their argument to its logical conclusion. Knowing the purpose of the Regulation, and construing it in light of their knowledge, they must also have known that the Treasury could not indefinitely go on supplying silver, and meant to stop when the clad coinage was ready. Naturally, therefore, as reasonable men, they would have looked in the Regulation to see if it included a clause fixing the time and manner of termination. Finding none, they would not conclude that the Regulation was meant to go on indefinitely, but, more rationally, that Treasury reserved to itself the decision as to time and manner of termination. They might expect Treasury, as a responsible Government department, not to discriminate, and to terminate across the board when it terminated at all. There is no charge here that it discriminated in terminating. Apart from this, the silence as to termination was pregnant with the affirmative that termination, when it came, could be swift and summary, or conversely, that sales would not go on a day after the need for them had ended. As a corollary of this, the possibility that termination might come after the filing of an application but before consummation of a sale pursuant to it would have appeared as a real one. If the plaintiffs expected their applications to be processed and approved, though the need for the sale had ended, they had an expectation contrary to the understanding of the overall situation they should have had, and say through their counsel they did have. Thus we think, following plaintiffs' reasoning, that if buyers reasonably construed the Regulation, because of attendant circumstances, as a binding offer to sell, they also, from the same circumstances, viewed the offer as terminable when the need for it ended, at any time before actual sale and passage of title to a specific lot of silver.

In summary, we can find no reasons, legal or equitable to grant judgment for the plaintiffs. The Government offered Treasury silver for sale at a stated price

solely to hold the market price down in order to protect the coinage. The plaintiffs benefitted from this policy until the sales were discontinued. They were not overreached or misled. They did not change their position, expend any sums, forbear any action or otherwise rely to their detriment on any representations of the defendant. The plaintiffs were fully aware of the purpose of these sales and had no reasonable basis to believe that the silver at the $1.29+ price would continue available any longer than necessary to effectuate the Government policy.

Plaintiffs' motion for summary judgment is denied and their petition is dismissed. Defendant's motion is granted.