**PRIMARY METAL & MINERAL CORP.**

v.

**The UNITED STATES.**

**MOCATTA & GOLDSMID, LTD., et al.**

v.

**The UNITED STATES.**

**Nos. 88–73, 149–73.**

United States Court of Claims.

May 18, 1977.

James H. Mann, Washington, D.C., for plaintiff Primary Metal & Mineral Corp., Joseph B. Friedman, Washington, D.C., attorney of record. Lucas, Friedman & Mann, Washington, D.C., of counsel.

Ralph A. Muoio, Washington, D.C., for plaintiffs Mocatta & Goldsmid, Ltd., et al., Mortimer M. Caplin, Washington, D.C., attorney of record. H. David Rosenbloom, John F. Dienelt, Jeffrey M. Glosser and Caplin & Drysdale, Washington, D.C., of counsel.

James F. Merow, Washington, D.C., with whom was Acting Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant.

Before COWEN, Senior Judge, DAVIS, Judge, SKELTON, Senior Judge, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges, En Banc.

OPINION

NICHOLS, Judge, delivered.

These cases come before the court on defendant's Rule 143 exceptions to the trial commissioner's (trial judge) findings. This matter was first directed to the attention of the Chief Commissioner (Chief, Trial Division) pursuant to H.R.Res. 108, 91st Cong., 2d Sess. (1970), referring to him H.R. 17968, 91st Cong., 2d Sess. (1970), a bill to provide compensation to certain silver-dealer claimants: Moccata & Goldsmid, Ltd.; and Sharps, Pixley & Co., Ltd., who do business in London, Primary Metal & Mineral Corp., an American company, and others. The trial commissioner concluded that, on undisputed facts, plaintiffs are entitled to recovery from the United States on a contract theory, within our general jurisdiction, 28 U.S.C. § 1491. The availability of a legal remedy would make legislative relief inappropriate, but plaintiffs had already sued

under 28 U.S.C. § 1491, and by stipulation the report is received as if filed in these cases. Without addressing ourselves to the equities of these circumstances, upon which the Congress might yet deem plaintiffs worthy of relief, we hold that plaintiffs had no contracts with the United States. Therefore, we return this matter to the Trial Division for whatever further proceedings are necessary in preparation of a report to the Congress.

These cases arise from the Treasury Department's decision of May 18, 1967, to discontinue selling silver from United States stocks, except to industrial users not at issue here. In 1963, Treasury had announced that it would sell silver bullion from the stocks at a price of $1.292929292, the monetary value of the value of the silver in the silver dollar. Prior to May 18, prospective silver purchasers, including plaintiffs, were accustomed to calling the New York Federal Reserve Bank (Fed) by telephone, to reserve whatever quantity of silver they desired to purchase. Tellers had no authority to discuss or reject any request. The Fed relayed this information received to the United States Mint's New York Assay Office where the particular silver bars that would most nearly fill a purchaser's request were designated. Because the weight and purity of the silver bars varied slightly, the total value of the transaction could not be precisely ascertained until the Assay Office had identified the particular bars with a particular transaction. Then the Assay Office advised the Fed that the silver was available for delivery and the Fed notified the purchaser of the amount of funds that must be tendered. When the Fed collected the purchaser's funds it issued a receipt that the purchaser presented to the Assay Office when ready to take delivery. Treasury devised these procedures in order to implement its public notice, 28 Fed.Reg. 7530 (1963), which designated the New York and San Francisco Assay Offices as places where silver bullion was available. Treasury devoted most of the text of that notice to outlining the steps made necessary by its requirement that purchasers exchange only silver certificates

for bullion, but this requirement was withdrawn before the transactions at issue, 29 Fed.Reg. 3819 (1964), and are not relevant to this case even though the notices themselves had not been changed. What is pertinent, nevertheless, is that both notices invariably speak of a purchaser's "requests" for silver. To this effect, the earlier notice stated:

Pursuant to the authority of Public Law 88–36 of June 4, 1963, I [the Secretary of the Treasury] hereby designate the United States Assay Office at New York City * * * and San Francisco as places where silver bullion may be obtained * * *. All *requests* for silver bullion in exchange for silver certificates shall be directed to the Fiscal Assistant Secretary of the Treasury * *. Such *requests* may be made through the Federal Reserve Bank * * .

At the time of making such *request,* silver certificates shall be tendered to the Treasurer of the United States * * *. [28 Fed.Reg. 7530 (1963).] [Emphasis supplied.]

Completely lacking is any reference to any purported "offer" by the Treasury or a purchaser's "acceptance" or any language sounding in contract whatsoever.

At 3:30 in the afternoon of May 18, 1967, Treasury announced that it would deliver no more silver. However, it honored requests phoned in the previous day and requests made that day when they had been processed as far as the notice to the purchaser of the payment he was to make. Earlier that day the Assay Office had been informally instructed to cease playing its part in the sales; otherwise some or all of the orders could have been honored before the cutoff time. Plaintiffs were in short positions and had to make good their commitments by purchases at over the $1.29 price. They say they believed that their phone calls to the Fed, without more, brought binding contracts into being. This was the custom of the London silver market.

Plaintiffs contend that their calls were their acceptance of the Government's stand-

ing offer to sell silver at the price fixed by statute, which obligated the Government by contract to deliver. The Government's refusal to do so, plaintiffs continue, was the Government's breach of contract, for which it is now liable to plaintiffs for damages. The trial commissioner agreed, but we take the opposite view. We cannot attach to Treasury's regulations or procedures the legal effect of extending a standing offer to all prospective purchasers who might thereafter by telephone bind the Government to deliver any desired quantity of silver, at a fixed price. Since the Government extended no offer, plaintiffs' telephoned requests constituted no acceptances, and resulted in no contract.

In *Cutler-Hammer, Inc. v. United States,* 441 F.2d 1179, 194 Ct.Cl. 788 (1971), the claimant was an industrial silver user who continued to participate in silver purchases after the May 18 cutoff, as the new announcement permitted sales to that class of buyer. It suffered a sudden cutoff on July 14, 1967, with several of its requests left unfilled. Our decision to dismiss its petition rested on several grounds, some of which are peculiar to that case and some applicable here. In the latter class is the absence of offer and acceptance or contractual sounding language in the Regulation under which the sales after May 18 were made. It started out, "An application for the purchase of silver may be filed * *." We commented

> In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention. [Citation omitted.] We find nothing in the language of the Regulation or the acknowledgement which could be construed as contractual in nature, by that standard. That is, nowhere is there a *promise* [emphasis in original] on the part of the Government to sell even one ounce of silver at the price mentioned. * * *
> [441 F.2d at 1182, 194 Ct.Cl. at 794.]

By that analysis, there was no contract here either. There were, however, added grounds to support the conclusion in that case. Still, the language quoted reflected an analysis that, by itself, could have been fatal to the *Cutler-Hammer* claim.

Our conclusion there and here stems in part from the purpose underlying Treasury's statutory authority for these silver sales, 31 U.S.C. § 405a–1 (Supp. V 1965–69). We reviewed the relevant legislative and regulatory history in *Cutler-Hammer, Inc.,* 441 F.2d at 1180–81, 194 Ct.Cl. at 791, *citing* H.R.Rep. No. 509, 89th Cong., 1st Sess. (1965). We noted that Treasury's sole aim in selling silver was to hold down the market price of silver which threatened to rise high enough to promote hoarding of coins or melting them for their silver content. The danger that a coin shortage might result would not subside until Treasury produced and released into circulation a sufficient supply of our now-familiar nonsilver, "sandwich" coins. Until then Treasury felt compelled to protect the silver coinage by meeting the market demand for silver from its own free silver stocks at the price equal to the value of silver in the coins. By mid-May 1967, although the silver coinage had been protected, the silver stocks were being depleted at an alarming rate, causing concern that Treasury's supply of available silver might be exhausted within weeks. Balancing these various aspects of monetary policy, and considering its supply of nonsilver coins by then sufficient, Treasury decided on May 18 to halt silver sales immediately. We are convinced that Treasury's only interest in entering these transactions and in discontinuing them was in furthering monetary policy.

The trial commissioner thought this irrelevant to the contract question; we, rather, think it resolves the question. Treasury was not a commercial trader in the silver market for profit but a reluctant seller of silver for a different purpose, to alleviate the troublesome pressure on the coinage. The last thing it wanted was to bind someone who might in the end not consummate the purchase. At times there were prospective buyers who reneged, and this could only be welcome. We pointed out in *Cutler-Hammer,* that any reasonable partici-

pant in the volatile silver market of those days was put on notice by the statute and regulation that Treasury's involvement in the market was altogether inseparable from monetary policy. All had reason to expect that Treasury would abandon the marketplace just as soon as doing so would serve monetary purposes. And, indeed, the trial commissioner found that all could see from published reports that Treasury's remaining silver stocks would soon be exhausted if sales continued for many more weeks at their then-current volume. We can only conclude that Treasury developed procedures that reserved to itself the opportunity to evaluate each transaction in light of its effect on monetary stability.

The plaintiffs' theory would require that tellers at the Fed were somehow, without a written word, designated as Government contracting officers. Just by accepting phone calls they could create obligations to deliver unlimited quantities of silver, perhaps all the Treasury had, to parties, possibly unknown, possibly mere pranksters. Plaintiffs conceded on oral argument that, by their theory, any such call would be legally effective at least to put a hold on any silver remaining, until the caller either did or did not show up with the money required. Since by plaintiffs' theory the tellers were Government contracting officers, plaintiffs were obliged by the rule of *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947), to know the limits of their authority. Had they inquired, they would have learned that no authority had been delegated. If Treasury failed to take sufficiently into account the *mores* of the market in which plaintiffs dealt, which made binding commitments out of telephone calls, this is a matter of equity which we cannot consider under the limits of our jurisdiction.

Much of this we said in *Cutler-Hammer*. We venture no suggestion, though, that *Cutler-Hammer* of itself disposes of this case, for it addressed subsequent events and involved a later version of Treasury's procedures. Yet, our understanding of Treasury's purpose and intent in selling silver applies equally to both situations. They rest upon the same legislative authority and spring from the same monetary goals. Neither, of course, has the law of contracts changed so radically since *Cutler-Hammer* to invalidate the principles we cited there. An offer to contract embodies an intent in the offeror to be bound to his bargain immediately upon the offeree's acceptance. An offeror reserves no opportunity to reconsider the bargain after acceptance is made, so the subject matter of the offer, especially the quantity of goods sold, must be definite. We are not asked to speculate over when the Government might have extended an offer to sell silver, but only to decide whether such an offer was made by the Government's open invitation for plaintiffs to call in requests. We hold that it was not.

The possible effect of 31 U.S.C. § 200 as a bar to the claims was discussed but not flatly relied on by defendant. Our conclusion reached on other grounds makes it unnecessary to consider it here.

Accordingly, we conclude that plaintiffs are not entitled to recover on their legal theory and their petitions are dismissed. The matter is returned to the trial commissioner for further measures pursuant to H.R.Res. 108.

SKELTON, Senior Judge, dissenting:

I respectfully dissent, because in my opinion the plaintiffs, Primary Metal & Mineral Corp., Mocatta & Goldsmid, Ltd., Sharps, Pixley & Co., Ltd., and Samuel Montagu & Company, Ltd., had binding contracts with the Treasury for the purchase of silver which were breached by the Treasury, and by reason of all of which the plaintiffs have legal claims for damages and are entitled to recover. For the sake of brevity, I adopt by reference the findings of fact and the conclusions made by Trial Judge (Commissioner) George Willi in Congressional Reference Case No. 7–70, containing 149 pages, as filed by him on March 31, 1976, as my

dissent in this case.[1] For emphasis, explanation, and clarity, I repeat his ultimate findings of fact and conclusions, insofar as they apply to these plaintiffs, as follows:

### ULTIMATE FINDINGS OF FACT

1. Beginning not later than June 27, 1966, when it abandoned its previous requirement for a corresponding redemption of silver certificates, and until 3:30 p.m. on May 18, 1967, the U.S. Treasury, acting through the New York Fed, its duly constituted fiscal agent, offered to receive and process orders from the public at large for unrestricted quantities of the silver bullion that was held in Treasury stocks; the bullion to be sold in multiples of bars weighing approximately 1,000 ounces each, at a price of $1.29-plus per ounce, delivery f.o.b. the Treasury Department's New York Assay Office.

2. Both Treasury's willingness to accept and process orders for the silver that it owned and the means by which the processing would be done were freely communicated to the public at large.

3. The established procedure for processing orders for Treasury silver entailed (1) an interested purchaser notifying the Fed of the quantity of silver that he wanted to buy, (2) the Fed's relaying to the New York Assay Office the identity of the purchaser and the amount of his order, (3) the New York Assay Office segregating from its total bullion inventory those 1,000-ounce bars most nearly aggregating the total amount of the order and advising the Fed of the exact total weight of the bars selected, (4) the Fed calculating the total price, at the rate of $1.29-plus per ounce, of the bars selected by the Assay Office to fill the order, (5) the Fed advising the purchaser of the exact quantity of silver that had been reserved for him and the total price of that silver, (6) the purchaser making payment to the Fed of the total price and receiving from it the documents necessary to enable him to secure release of the silver from the Assay Office, and (7) presentation by the purchaser of those documents to the Assay Office and receipt by him of his silver. Under this procedure, a purchaser's ability to secure silver from the Treasury was limited only by the availability of silver in Treasury stocks, by his tender of payment, satisfactory in form and amount, to the Fed and by his willingness to take delivery of his silver from the Assay Office within 10 days of placement of his order with the Fed.

4. Treasury first revoked the offer delineated in Ultimate Finding 1, *supra,* by its press release of 3:30 p.m., May 18, 1967, stating, in part: *"Effective immediately, the Treasury Department is discontinuing sales of silver to any buyers other than legitimate domestic concerns which use silver in their businesses."* (Emphasis added).

5. The orders that the claimants herein placed with the Fed prior to 3:30 p.m. on May 18, 1967, were in response to the Treasury's offer to receive such orders and process them in accordance with its established practice, as described in Ultimate Finding 1, *supra.*

6. There is no indication in the evidence that the orders placed with the Fed prior to 3:30 p.m. on May 18, 1967, would not have been filled in due course had the Treasury permitted those orders to be processed in accordance with the procedures that it had established and maintained for the processing of such orders.

7. The Treasury Department's telephone directive to the New York Assay Office at about noon on May 18, 1967, effectively prevented the further processing of orders placed with the Fed prior to 3:30 p.m. on that day and thereby deprived the persons who had placed such orders of the opportunity to complete their respective purchases. The practical effect of this action by the Treasury was to terminate the silver sales program as of the close of business on May 17, 1967, rather than at 3:30 p.m. on May

---

1. The findings of fact made by the trial judge are presumed to be correct under our Rule 147. The defendant did not discharge its burden of overcoming this presumption in this case. Its exceptions to the findings, standing alone, are not sufficient for that purpose.

18, 1967, as its announcement at that time purported to do.

8. The agreements that resulted from the orders placed prior to 3:30 p.m. on May 18, 1967, in response to the Treasury's then outstanding offer to receive such orders and process them in accordance with established practice, were in default on June 2, 1967.

9. The silver represented by the unfilled orders placed prior to 3:30 p.m. on May 18, 1967, for delivery at the New York Assay Office by June 2, 1967, was obtainable by the claimants on the latter date at the New York Commodity Exchange at the arm's length price of $1.80 per ounce.

10. On May 18, 1967, the Treasury neither had nor had reason to have any knowledge of the then current trading positions of any of the claimants involved in this proceeding.

11. Mocatta, Sharps, Pixley and Primary have all failed to establish by a preponderance of the evidence that at any time after June 2, 1967, they made any timely purchases of silver in substitution of that which they ordered from the Treasury on May 18, 1967, but did not receive.

12. Not later than June 1967 Mocatta, Sharps, Pixley, and Primary initiated efforts designed to induce the Treasury Department to voluntarily fill their unfilled orders of May 18, 1967. Although the formal representations made to the Treasury on behalf of each of those firms, particularly the British claimants, included the assertion that the failure to fill the orders of May 18 constituted a breach of contract, the predominant contention urged by them was that the orders should be filled on broad principles of equity and morality because the disappointed buyers had themselves previously entered into firm sales commitments in reliance on being able to secure the silver necessary to redeem them from the Treasury. The factual accuracy of these representations was, at least in part, called into question by certain testimony candidly volunteered on behalf of Mocatta at the trial. Since it was never suggested that the Treasury had knowledge of the prior sales activities or current trading positions of persons ordering silver from the Fed, the entire matter of the previous sales commitments of persons who ordered silver from the Fed on May 18, 1967, is totally irrelevant to a determination of both the liability and damage aspects of the question of whether Treasury's failure to fill those orders amounted to a breach of contract that was fully redressable at law. For its part, the Treasury, uniformly insisting that no breach of contractual obligations concerning the unfilled orders of May 18 ever occurred because in its view none had ever been created, did nothing to discourage extended consideration of the equitable aspects of the claims. In fact, the Treasury sponsored submission of the problem of the unfilled May 18 orders to the Joint Commission of the Coinage for an official expression from that body as to the disposition that should be made of those orders; this despite strong and repeated protest from several members of the Commission that consideration of the subject was beyond the body's legitimate jurisdiction because the problems presented were of a legal rather than a policy nature.

13. At the joint request of the Treasury and a majority of the members of the Coinage Commission, the General Accounting Office (GAO) undertook an extensive audit investigation of the trading activities, both before and after May 18, 1967, of the British claimants and Primary with a view to ascertaining both the short positions of those firms on May 18 and the manner in which those positions were ultimately liquidated.

14. Finally, the Treasury Department actively encouraged a majority of the Coinage Commission, over the strong objection of some of its members, to endorse the initiation of legislative activity calculated to result in a Congressional Reference of the May 18 unfilled order question to the Chief Commissioner of the United States Court of Claims.

15. The only testimony offered before Subcommittee No. 2 of the Committee on the Judiciary, House of Representatives on behalf of any of the claimants involved in

this proceeding was that given by counsel for the British claimants on September 11, 1969. In the course of that testimony counsel's attention was expressly directed by Subcommittee members to the provisions of the Subcommittee's Rule 14, and he was repeatedly called upon to advise the Subcommittee whether in his opinion the claimants could state a legal claim, sounding in contract, on which a judgment could be entered in respect to the unfilled orders of May 18. Though stopping short of an outright denial that a legally redressable claim existed, counsel expressed a variety of purported misgivings, including at one point the bar of limitations, that he held concerning the availability of legal relief.

16. On December 21, 1970, when the Clerk of the Court of Claims, acting in accordance with the applicable rules, formally notified each claimant identified in H.Res. 108 of the transmittal of that Resolution and H.R. 17968, 91st Cong., 2d Sess., to the Chief Commissioner for proceedings under 28 U.S.C. § 2509 there remained almost 2½ years in which those claimants could have timely instituted a suit in the Court of Claims against the United States for breach of contract in respect to the unfilled orders of May 18, 1967. See 28 U.S.C. § 2501.

17. Of the claimants identified in H.Res. 108 and H.R. 17968 only the following ever filed a petition in the instant proceeding.

Mocatta & Goldsmid, Ltd.
Samuel Montagu, Ltd.
Sharps, Pixley & Co., Ltd.
Primary Metal & Mineral Corp.
Herbert Rauscher
Gerald Metals, Inc.
John Angelos
Russell C. Graef

18. All claimants herein, except for Russell C. Graef, have appeared by counsel throughout this proceeding. Mr. Graef has at all times proceeded *pro se.*

19. Except as to the claim filed by Russell C. Graef, the defendant's answers in this proceeding all contained a specially pleaded affirmative defense denying claimants' entitlement to equitable relief to the extent that it was determined that their claims were redressable at law. At the time of these answers, almost 2 years still remained in which the claimants could have timely filed actions at law for breach of contract. On March 13, 1973, Primary filed such a suit in the United States Court of Claims and the British claimants did the same on May 9, 1973. On October 24, 1974, Samuel Montagu & Co., Ltd. filed a voluntary motion for dismissal with prejudice in the instant proceeding but did not similarly dismiss its lawsuit.

20. In view of the circumstances described in Ultimate Findings 17, 18, *supra,* it is concluded that none of the following claimants had a justifiable excuse for not having timely resorted to the established legal remedy that was available to them in respect to their unfilled orders of May 18, 1967 [28 U.S.C. § 2509(c)]:

Herbert Rauscher
Gerald Metals, Inc.
John Angelos

21. Because he proceeded without the benefit of counsel and because the defendant's answer to his claim did not include the same affirmative defense set forth in all of the other answers filed in this proceeding, as described in Ultimate Finding 18, *supra,* it is concluded that Russell C. Graef had a justifiable excuse for his failure to resort to an established legal remedy in respect to his unfilled order.

22. On September 19, 1973, Primary moved for summary judgment in the lawsuit that it had filed in the previous March. The British claimants participated in that proceeding as *amicus curiae.* By an order of April 24, 1974, the court suspended further proceedings in Primary's suit until 6 months after the Chief Commissioner reported to Congress in the reference proceeding under 28 U.S.C. § 2509.

## CONCLUSIONS

1. At least for the period from June 27, 1966, if not before, until 3:30 p.m. on May 18, 1967, the announced policy and procedures of the Treasury Department imple-

menting its objective of stabilizing the market price of silver constituted a continuing offer to the public at large to accept orders for unrestricted quantities of Treasury silver at $1.29-plus per ounce, f.o.b. New York, and to process such orders in the manner that it had established for so doing.

2. At no time prior to 3:30 p.m. on May 18, 1967, did the Treasury Department purport to revoke the offer described in the preceding paragraph.

3. The silver orders that the claimants placed with the Fed prior to 3:30 p.m. on May 18, 1967, constituted individual acceptances of the offer defined in Conclusion 1, *supra.*

4. Both the Treasury's general failure to apply its established processing procedures to orders placed with its fiscal agent prior to 3:30 p.m. on May 18 and its affirmative intercession with the Assay Office at about noon of that day to absolutely prevent such processing constituted unlawful breaches of the contracts that had been formed by the offer set forth in Conclusion 1, *supra,* and the acceptances identified in Conclusion 3, *supra.*

5. All of the claimants herein had fully available an established legal remedy to totally redress their respective injuries from the breaches of contract described in the preceding paragraph; that remedy being the filing of suit against the United States in either the United States Court of Claims under 28 U.S.C. § 1491 or, in the case of claimants Angelos and Rauscher, in the appropriate United States District Court under 28 U.S.C. § 1346(a)(2).

6. There being insufficient evidence of (1) an efficacious attempt by any claimant to cover the amount of silver due from but undelivered by the Treasury and of (2) any entitlement to an award of consequential damages, a lawsuit filed by or before May 18, 1973, for breach of contract would have entitled each of the claimants to damages, without interest (28 U.S.C. § 2516), measured by the difference between contract price and the price at which comparable quantities of silver were obtainable in the New York market at date of delivery, as set forth below:

| | |
|---|---|
| Mocatta & Goldsmid | $1,521,300.00 |
| Sharps Pixley & Co., Ltd | $1,014,200.00 |
| Primary Metal & Mineral Corp. | $ 862,070.00 |
| Gerald Metals, Inc. | $ 152,130.00 |
| Russell C. Graef | $ 12,677.50 |
| John Angelos | $ 2,028.40 |
| Herbert Rauscher | $ 1,014.20 |

7. Because Mocatta, Sharps, Pixley, and Primary all have timely-filed suits currently pending in the United States Court of Claims, by which they can obtain full legal relief in respect to the unfilled orders that they placed prior to 3:30 p.m. on May 18, 1967, the question of whether any amounts are "equitably due" them from the United States within the contemplation of 28 U.S.C. § 2509(c) is not properly reached at this time.

8. Because Gerald Metals, John Angelos and Herbert Rauscher failed without justifiable excuse to avail themselves of an established and fully adequate legal remedy, an award to them in respect to their unfilled orders of May 18, 1967, would amount to a "gratuity" within the meaning of 28 U.S.C. § 2509(c).

9. Because Russell C. Graef's failure to timely pursue the established legal remedy that was available to him was excusable under his particular circumstances, $12,-677.50 is "equitably due" him within the meaning of that concept as it appears in 28 U.S.C. § 2509(c).

The manner in which the Treasury breached its contracts with the plaintiffs by secretly instructing the New York Assay Office at noon on May 18, 1967, not to process orders for silver received on that day up to 3:30 p.m., while at the same time allowing the New York Federal Reserve Bank as its agent to receive orders for silver up to 3:30 p.m. (which included plaintiffs' orders), without any prior notice to plaintiffs, smacks of deceit and overreaching. Such conduct on the part of an agency of the government should not be tolerated or condoned by this court.

Trial Judge Willi should be commended for the very thorough and painstaking way in which he handled the Congressional Ref-

erence case involved here. His findings of fact, ultimate findings of fact, and conclusions are correct and should be adopted by the court as far as they are applicable to the four plaintiffs in these cases.[2]

I would hold that the plaintiffs have both legal and equitable claims against the government for damages for breach of contract that are redressable in this court. I would enter judgment in favor of the plaintiffs against the government in the following amounts, respectively:

| | |
|---|---|
| Mocatta & Goldsmid | $1,521,300 |
| Sharps, Pixley & Co., Ltd | $1,014,200 |
| Primary Metal & Mineral Corp. | $ 862,070 |
| Samuel Montagu & Company, Ltd. | $1,521,300 [3] |

The following petitioners in Congressional Reference No. 7–70 never filed petitions in this court, and, accordingly, are not within the general jurisdiction of the court and the court has no authority to enter any kind of judgment on the merits of their claims:

Herbert Rauscher
Gerald Metals, Inc.
John Angelos
Russell C. Graef

It is assumed that the report of the trial commissioner (now trial judge), as adopted by the review panel of commissioners (now trial judges) of this court with respect to the claims of these petitioners, will be forwarded to the House of Representatives of Congress by our Chief Trial Judge, all in accordance with 28 U.S.C. § 2509, *as amended* (1966).

---

2. The parties have filed motions requesting the court to conduct further proceedings in these cases based on the record, the opinion, findings of fact, ultimate findings of fact, and conclusions of the Trial Judge (Commissioner) in Cong.Ref.No. 7–70.

3. The parties have stipulated that the damages of Samuel Montagu & Company, Ltd. under the Trial Judge's theory would be $1,521,300.