The LOMAS & NETTLETON COMPANY

v.

The UNITED STATES.

No. 279–81C.

United States Claims Court.

Dec. 20, 1982.

John F. Dienelt, Washington, D.C., for plaintiff; Philip N. Brownstein, Barry P. Rosenthal, Robert A. Smith, Washington, D.C., William S. Barron, Jr., Dallas, Tex., Brownstein, Zeidman & Schomer, Washington, D.C., and Brice & Barron, Dallas, Tex., of counsel.

Thomas W.B. Porter, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Phyllis Slesinger, Dept. of Housing and Urban Development, Washington, D.C., of counsel.

## ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

### OPINION

WHITE, Senior Judge.

The plaintiff bases this action upon the contention that the defendant breached a contract to sell FHA-insured mortgages to the plaintiff.

Both sides have moved for summary judgment on the issue of liability. After carefully considering the arguments of both sides, it is concluded that neither party is entitled to summary judgment.

### Agreed Facts

On October 16, 1975, the Government National Mortgage Association (GNMA), a wholly owned government corporation within the Department of Housing and Urban Development, announced the creation of the Project Mortgage Sale Program (the program). Under the program, GNMA would sell certain FHA-insured mortgages on housing projects to FHA-approved mortgagees. In a notice and memorandum sent to all FHA-approved mortgagees, including the plaintiff, GNMA invited offers for the purchase of mortgages and options on mortgages. The notice stated that the purchase prices for the mortgages would be announced periodically. The notice also stated that the detailed terms and conditions of the program were set forth in Chapter 10 of the GNMA Seller's Guide. Sales of the mortgages were to be made through the regional offices of the Federal National Mortgage Association (FNMA), a private corporation which acts as an agent for GNMA in certain matters relating to the purchase, sale, and servicing of mortgages.

The authority of FNMA to act for GNMA under the program is defined by the Combined Services Agreement between GNMA and FNMA, and by the Code of Federal Regulations. The Combined Services Agreement, dated July 1, 1975, provides that "[t]he services to be rendered pursuant to this agreement shall be in conformity with * * * the GNMA Seller's Guide * *," and that "FNMA shall perform services related to the sale of GNMA mortgages following the procedures in the * * * instructions issued by GNMA to FNMA regarding such sales." The Code of Federal Regulations confers on certain FNMA employees the authority to act as attorneys-in-fact for GNMA. This authority will be discussed in detail later in the opinion.

The GNMA Seller's Guide provides Chapter 10 that offers for mortgages and applications for mortgage options should be submitted to FNMA regional offices, along with the correct fee. The Seller's Guide further states that acceptance by GNMA of a mortgage or mortgage application "shall be indicated by completing and executing the form of 'Acceptance' provided thereby, and returning one executed copy to the applicant." GNMA reserves the right to reject any offer for a mortgage or any application for a mortgage option in its discretion. GNMA also reserves the right "to alter or waive any of the requirements" contained in the Seller's Guide.

On October 21, 1975, the plaintiff, a mortgage banker and FHA-approved mortgagee, with its principal place of business in Dallas, Texas, delivered to the FNMA Midwestern Regional Office in Chicago applications to purchase options on 28 mortgages. The applications complied with the terms of the GNMA notice and were accompanied by a check for $71,062.64 in payment of the option fee. The applications were stamped "received" at 4:43 p.m. by the FNMA Chicago office.

On October 23, 1975, GNMA ordered all FNMA regional offices to suspend activities under the program.

On the same day, October 23, 1975, a representative of the plaintiff arrived at the FNMA Chicago office, expecting to obtain executed copies of the plaintiff's applications. Because of the program suspension, Michael Kornecki (Mr. Kornecki), a senior project loan representative and an attorney-in-fact for GNMA in the FNMA Chicago office, refused to execute or deliver any of the plaintiff's applications. Later, the FNMA Chicago office returned the plaintiff's check and unexecuted copies of its applications on October 29, 1975. Then, on March 1, 1976, FNMA advised the plaintiff that its applications had been rejected.

After unsuccessful administrative protests, the plaintiff filed an action in the United States District Court for the Northern District of Texas. That action was dismissed on jurisdictional grounds.

### Events of October 22, 1975

A dispute exists between the parties as to what happened on October 22, 1975, the next day after the plaintiff's applications were submitted to the Chicago office of FNMA. The plaintiff alleges that on October 22, Paul M. Low (Mr. Low), senior vice president of the plaintiff, telephoned Mr. Kornecki to inquire about the plaintiff's applications. On the same day, GNMA had announced that it was raising the price of mortgages; and the plaintiff alleges that Mr. Low called to determine whether the plaintiff would be charged the higher price. According to the plaintiff, Mr. Kornecki told Mr. Low that "you have a deal" for the mortgages at the original price, and that "you sure have made a killing." The plaintiff further alleges that Mr. Low asked Omar Thomas, a vice president of the plaintiff in its Chicago office, to arrange to pick up copies of the executed applications; and that on the afternoon of October 22, Omar Thomas called Mr. Kornecki, and the latter said that the executed applications could be picked up the next day.

The defendant disputes the plaintiff's allegation that a telephone conversation occurred between Messrs. Low and Kornecki on October 22, 1975, and denies that Mr. Kornecki told Mr. Low "you have a deal" and "you sure have made a killing." The

defendant denies that Mr. Kornecki said anything to Mr. Low or to Omar Thomas indicating that the defendant had accepted the plaintiff's applications.

The defendant contends, however, that any factual dispute between the parties concerning the events of October 22, 1975, is immaterial. The defendant's theory is that the parties could not have reached a binding oral agreement as a matter of law, because: (1) FNMA regulations required an acceptance of an application to be executed in writing, plus the return of an executed copy to the applicant; and (2) Mr. Kornecki had no authority to waive this requirement.

■ It has been mentioned previously that Chapter 10 of the GNMA Seller's Guide expressly provided that acceptance by GNMA of an application "shall be indicated by completing and executing the form of 'Acceptance' provided thereby, and returning one executed copy to the applicant." The agreed facts show that the defendant never executed the plaintiff's applications. It is well settled, of course, that an offeror may prescribe the precise manner in which an offer must be accepted. Restatement (Second) of Contracts § 30 (1981).

■ The plaintiff contends, however, that the Seller's Guide merely suggested a means of acceptance and, consequently, that, under equally well established principles of contract law, the offer could be accepted in any other reasonable manner. Restatement (Second) of Contracts § 30(2). The plaintiff's position is not supported by the language of the Seller's Guide, which provides that an acceptance "*shall* be indicated by completing and executing the form" (emphasis supplied). The use of a word of command, "shall," compels the conclusion that the language is mandatory and not merely directory or precatory. *Cf. Bergen v. United States,* 213 Ct.Cl. 609, 612 n. 3, 562 F.2d 1197, 1198 n. 3, *cert. denied,* 434 U.S. 939, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977). The plaintiff's authorities for the proposition that the Government may be bound by oral contracts are inapposite. This court's predecessor, the U.S. Court of Claims, held

that where a statute, regulation, or contract requires a written acceptance, an oral acceptance is ineffective. *SCM Corp. v. United States,* 219 Ct.Cl. 459, 464, 595 F.2d 595, 598 (1979); *American General Leasing, Inc. v. United States,* 218 Ct.Cl. 367, 373–75, 587 F.2d 54, 57–58 (1978); *McCarty Corp. v. United States,* 204 Ct.Cl. 768, 774–75, 499 F.2d 633, 637 (1974); *International Telephone & Telegraph v. United States,* 197 Ct.Cl. 11, 24–26, 453 F.2d 1283, 1291 (1972); *G.C. Casebolt Co. v. United States,* 190 Ct.Cl. 783, 788–90, 421 F.2d 710, 713–14 (1970) (Collins, J., concurring). Consequently, the execution of the plaintiff's applications, and the return of executed copies to the plaintiff, were conditions precedent to the formation of contracts under Chapter 10 of the GNMA Seller's Guide. *Molton, Allen & Williams, Inc. v. Harris,* 613 F.2d 1176, 1178 (D.C.Cir.1980).

■ The plaintiff's contention that there is a custom or practice in the mortgage banking industry of treating oral commitments as binding contracts is equally unavailing. It is well settled that evidence of trade custom or practice cannot be used to vary or contradict unambiguous contract language. *Northwestern Industrial Piping, Inc. v. United States,* 199 Ct.Cl. 540, 550–51, 467 F.2d 1308, 1314 (1972); *S.S. Silberblatt, Inc. v. United States,* 193 Ct.Cl. 269, 288, 433 F.2d 1314, 1323 (1970); *WRB Corp. v. United States,* 183 Ct.Cl. 409, 436 (1968). There is no ambiguity in the language of the Seller's Guide establishing the execution of application forms and the return of executed copies to applicants as conditions precedent to contract formation.

■ Having concluded that execution of the plaintiff's application forms and the return of executed copies to the plaintiff were conditions precedent to contract formation under Chapter 10 of the GNMA Seller's Guide, it is necessary to decide whether Mr. Kornecki possessed the authority to waive the requirement. The defendant, relying principally on the affidavit of Mr. Kornecki's superior in the Chicago office of FNMA, Howard Morton, argues that Mr. Kornecki lacked any waiver authority. Be-

cause the Government cannot be bound by the unauthorized acts of its agents (*e.g., Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)), the defendant contends that any representations which Mr. Kornecki might have made to the plaintiff are immaterial.

■ An examination of the pertinent government regulations establishes, however, that Mr. Kornecki, as an attorney-in-fact for GNMA, did possess the authority to waive provisions in the Seller's Guide. The Code of Federal Regulations (24 C.F.R. § 300.11(a)(4)) empowers attorneys-in-fact for GNMA:

> (4) To assign, convey, sell, lease or sublease and to contract for the assignment, conveyance, sale, lease, or sublease of any real estate, chattel, security, or property of any sort or nature, or any interest therein, now held or hereafter acquired by the Association [GNMA].

The regulations (*id.* § 300.11(b)) provide further that:

> (b) The Association does further grant unto each of such attorneys-in-fact, and any other attorneys-in-fact designated and appointed pursuant to this section, full power and authority to do and perform all and every act and thing requisite, necessary, and proper to carry into effect the power or powers granted by or under this section as fully, to all intents and purposes, as the Association might or could do, and hereby does ratify and confirm all that each of such attorneys-in-fact, and any other attorney-in-fact designated and appointed pursuant to this section, shall lawfully do or cause to be done by virtue of the power or powers granted by or under this section.

The authority conferred by the Code of Federal Regulations is significant in light of the provision in Chapter 10 of the GNMA Seller's Guide which states:

*Exceptions.* In the conduct of its affairs, in individual cases or classes of cases, GNMA reserves the right, consistent with law, to alter or waive any of the requirements contained herein, or to impose other and additional requirements; it further reserves the right to rescind or amend any or all of the material set forth in this Guide.

GNMA's reservation of the right to waive provisions in the Seller's Guide, together with the authority conferred by the regulations on attorneys-in-fact for GNMA, empowered Mr. Kornecki to waive the execution and delivery requirements of the program. The Court of Appeals for the District of Columbia Circuit reached the same conclusion in *Molton, Allen & Williams, Inc. v. Harris, supra.*[1]

The defendant argues that the Combined Services Agreement requires that FNMA act in accordance with the Seller's Guide and other GNMA directives. This argument proves nothing, however, because the waiver provision is in the Seller's Guide, and there is no contrary provision in the Combined Services Agreement.

Moreover, the Howard Morton affidavit is not relevant in light of the plain language previously quoted from the Code of Federal Regulations and the Seller's Guide.

The plain language in the regulations and in the Seller's Guide also makes it unnecessary to resort to canons of construction, as the defendant urges. Attorneys-in-fact for GNMA were empowered to perform the acts "requisite, necessary, and proper" to sell mortgages and mortgage options.

■ In sum, Mr. Kornecki possessed the authority to waive conditions precedent to contract formation. The parties are in dispute, however, as to whether he did, in fact, waive the execution and delivery requirements in the present case. The affidavits and depositions of the parties contradict each other on this genuine issue of material fact.

---

1. Defendant inaccurately contends that the FNMA representative who waived the delivery requirement in *Molton, Allen & Williams* possessed greater authority than Mr. Kornecki. Both Mr. Kornecki and the official in *Molton,* *Allen & Williams* were loan representatives and attorneys-in-fact for GNMA. Moreover, the fact that the application forms in *Molton, Allen & Williams* had been executed had no bearing on the issue of waiver authority.

Mr. Low testified at his deposition that Mr. Kornecki told him he had a "deal" for the sale of the mortgage options. Mr. Low also stated that when he asked Mr. Kornecki whether the plaintiff would be charged a higher price established by GNMA on that day, Mr. Kornecki confirmed that the original price would be charged, and told Mr. Low that "you have made a killing."

The plaintiff also offers the depositions of two former officials in the FNMA Chicago office, Carroll Kisser and Phillip Staller. Mr. Kisser testified that Mr. Kornecki indicated that he had had an "affirmative type" conversation with representatives of the plaintiff about its mortgage option applications; and that in several conversations in the Chicago office, Mr. Kornecki expressed concern that he was "out on a limb" because of actions he had taken that were subsequently reversed by GNMA. Mr. Staller testified that Howard Morton, a senior official in the FNMA Chicago office, told him that Mr. Kornecki had told a representative of the plaintiff that he (the plaintiff's representative) had a deal.

Mr. Kornecki stated in his declaration and deposition that he had no recollection of the alleged conversation with Mr. Low on October 22, 1975, about the plaintiff's applications. Mr. Kornecki stated further that, contrary to Mr. Low's testimony, he would not have accepted the applications prior to determining whether the mortgages applied for were current or in a deferment or modification status. In this connection, all but two of the applications have the handwritten notation "Oct. pd." on the upper left-hand corner. The parties seem to agree that this notation indicates that status checks on the mortgages were completed, but it is not clear as to precisely when this occurred. The defendant points to the deposition testimony of the plaintiff's own witness, Mr. Low, as evidence that the status checks had not been completed at the time of the alleged telephone conversation between Messrs. Kornecki and Low, because, according to Mr. Low, Mr. Kornecki told him that he had a deal unless the mortgages were not current.

As pointed out in the previous discussion, the record demonstrates that there are genuine issues of material fact as to what happened between the parties on October 22, 1975, thus requiring a trial for resolution.

### Custom or Practice

There is also a dispute between the parties as to whether there is a custom or practice of relying on oral commitments in the mortgage banking industry.

The plaintiff has submitted affidavits in support of its position that there is such a custom or practice in the mortgage banking industry, and that it is applicable to dealings with FNMA and GNMA. The reason for this is said to be that the rapidly fluctuating market for mortgages necessitates reliance upon oral assurances that a binding contract exists. Proof of such a custom or practice would lend support for the reasonableness of the interpretation of the pertinent regulations (discussed in the preceding part of the opinion) as permitting waiver of the execution and delivery requirements prescribed in the Seller's Guide. *Cf. Molton, Allen & Williams, Inc. v. Harris, supra,* 613 F.2d at 1179.

The defendant, on the other hand, has submitted affidavits in support of its position that there was no recognized custom or practice of relying on oral commitments in dealing with FNMA's Chicago Regional Office.

The plaintiff contends that the defendant is collaterally estopped from litigating the issue of custom or practice. According to the plaintiff, the Court of Appeals for the District of Columbia Circuit resolved the same custom and practice issue against the defendant in *Molton, Allen & Williams, Inc. v. Harris, supra.* However, an examination of the decision in *Molton, Allen & Williams* reveals that the D.C. Circuit did not decide the same issue that is present in this action. Consequently, the

defendant is not collaterally estopped from contesting the issue of custom or practice.[2]

*Molton, Allen & Williams* arose under circumstances similar to the facts in this suit. On October 21, 1975, *Molton, Allen & Williams, Inc.,* applied to FNMA's Southeastern Regional Office in Atlanta for the purchase of 38 mortgage options under the program. On the following day, an authorized FNMA official executed acceptances for 32 of the applications.[3] On October 23, 1975, another FNMA official, Robert Pike, an attorney-in-fact for GNMA in the FNMA Atlanta office, informed a representative of *Molton, Allen & Williams* in a telephone conversation that the 32 option applications were in good order and that the acceptance portions had been executed. Mr. Pike offered to mail the executed forms to the applicant. However, later on the same day, before the forms were mailed, GNMA suspended the program. *Molton, Allen & Williams* then filed a breach of contract action. The D.C. Circuit held (613 F.2d at 1179–80) that although delivery of executed forms to the applicant was a condition precedent to contract formation, the FNMA official who talked with Molton, Allen & William's representative on the 'phone possessed the authority, which he exercised, to waive the condition. Specifically, the court found that there was a custom or practice of relying on FNMA and GNMA oral commitments.

In arguing that *Molton, Allen & Williams* does not collaterally estop it from litigating the custom or practice issue in the present action, the defendant points out, first, that in *Molton, Allen & Williams* the application forms were executed, although no executed copies were returned to the applicant, whereas neither execution nor delivery occurred in the present case. The *Molton, Allen & Williams* court found that execution of the forms, along with other factors, supported a conclusion that the parties had

formed a binding contract. The plaintiff's reliance here on collateral estoppel is not, however, directed at the issue of contract formation, but at the narrower issue of whether there existed a custom or practice of relying on oral commitments. It appears from reading the court's decision in *Molton, Allen & Williams* that the fact of execution was not material to the latter issue.

The defendant also points out that *Molton, Allen & Williams* established the custom or practice of only the FNMA Atlanta Regional Office. The situation in the FNMA Chicago office, according to the defendant, was different. In this connection, the program was administered by FNMA's five regional offices. Although each of the regional offices was required to comply with the terms of the GNMA Seller's Guide, it is plausible to suggest, as the defendant does, that some practices, not explicitly covered by the Seller's Guide, varied among the regional offices.

The affidavits and depositions upon which the D.C. Circuit relied in *Molton, Allen & Williams* did not establish a practice of relying on oral commitments in the Chicago Regional Office of FNMA. Consequently, the court's decision in that case does not preclude the defendant, under the doctrine of collateral estoppel, from litigating this separate issue in the present case.

Hence, there is a genuine issue of material fact in this case as to whether, at the time relevant here, a custom or practice existed in the FNMA Chicago office of relying on oral commitments. This is subsidiary to the issue discussed in the preceding part of the opinion as to whether, in fact, there was an oral agreement in this case.

### Offer and Acceptance

■ The plaintiff further contends, in support of its motion for summary judgment, that GNMA's announcement of the

---

2. Because it is decided that the issues in *Molton, Allen & Williams* and in this action are different, it is unnecessary to consider the relatively recent doctrine of offensive collateral estoppel. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

3. The official did not execute the other six applications because those mortgages were delinquent and not eligible for sale.

program constituted an offer which the plaintiff accepted by properly submitting the application forms and fee. This contention has no merit.

The notice announcing the program stated that "GNMA *invites offers* from FHA-approved Mortgagees and *invites applications* for the issuance of purchase options" (emphasis added). The Seller's Guide provided that the applications were subject to acceptance or rejection, and stated that "GNMA reserves the right to reject any Project Mortgage Application in its discretion."

On similar facts, the Court of Claims repeatedly held that invitations from the Government to submit applications are not, alone, offers to contract.

For example, in *Cutler-Hammer, Inc. v. United States,* 194 Ct.Cl. 788, 441 F.2d 1179 (1971), the plaintiffs in that case argued that a Treasury Department regulation providing for the submission of applications for the purchase of silver was an offer which the plaintiffs accepted by filing the forms. The Court of Claims held that the Treasury regulation was not an offer, and stated as follows (194 Ct.Cl. at 794–95, 441 F.2d at 1182–83):

> In general, the obligation of the Government, if it is to be held liable, must be stated in the form of an undertaking, not as a mere prediction or statement of opinion or intention. * * * We find nothing in the language of the Regulation or the acknowledgment which could be construed as contractual in nature, by that standard. That is, nowhere is there a *promise* on the part of the Government to sell even one ounce of silver at the price mentioned. Purchasers are simply invited to make "application" * * *. It requires a distortion of plain English to infer that making an application in conformity with the terms of this Regulation would constitute an acceptance of an offer whereby the United States intended to bind itself. [Emphasis in original.]

In *Tree Farm Development Corp. v. United States,* 218 Ct.Cl. 308, 585 F.2d 493 (1978), the plaintiff there had applied to the Department of Housing and Urban Development for a federal loan guarantee. After submitting a preapplication proposal, the plaintiff was informed that the Government would "consider an application." The plaintiff submitted an application; and, after the application was rejected, the corporation filed a breach of contract action. Holding that no contract had arisen between the plaintiff and the Government, the Court of Claims stated that "invitations by the Government to file applications do not necessarily equal an operative offer, the acceptance of which will result in a binding contract" (218 Ct.Cl. at 320, 585 F.2d at 500).

As in *Cutler-Hammer* and *Tree Farm Development Corp.,* the government program involved here merely invited offers and applications, and did not constitute an offer by GNMA which the plaintiff could accept by complying with the terms of the program. The language of the Seller's Guide previously quoted supports this conclusion, particularly GNMA's reservation of the right to reject applications in its discretion. GNMA was not divested of the discretion reserved by the Seller's Guide merely because the regional FNMA offices had a practice of accepting applications on a first-come-first-served basis.

In sum, the plaintiff could not reasonably have believed that, by simply submitting its applications, it was accepting an offer from the defendant.

### Conclusion

As there are genuine issues concerning material facts in this case, and as neither party is entitled to a judgment as a matter of law on the basis of the papers before the court, the cross-motions for summary judgment must be, and they are hereby, denied.