Thomas E. ZODA

v.

**UNITED STATES.**

No. 353–55.

United States Court of Claims.
Jan. 20, 1960.

Norman Roth, New York City, for plaintiff. Max E. Greenberg, New York City, was on the briefs.

William A. Stern, II, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LARAMORE, Judge.

Plaintiff, the assignee of Television Equipment Corporation (hereinafter referred to as TEC) sues to recover damages for the alleged unjustified termination of a contract to manufacture and deliver cathode ray oscilloscopes. Defendant is counterclaiming for excess costs on reletting.

The facts briefly are these: Plaintiff, on September 22, 1950, entered into a contract with the United States acting through the Civil Aeronautics Administration (hereinafter referred to as CAA) for the manufacture and delivery of 606 VHF cathode ray oscilloscopes for the sum of $105,965.16.

Prior to the award of the contract, TEC's plant was inspected by representatives of CAA. These representatives informed TEC that its testing equipment was inadequate. However, notice to proceed with performance under the contract was given TEC by the CAA on October 6, 1950.

The contract provided for the delivery of an initial unit 60 days from and including the effective date of the notice to proceed, 10 units within 30 calendar days after receipt by the contractor of the Government's approval of the initial unit, and remaining units at the rate of 40 units each 7-calendar-day period thereafter.

The specifications of the contract provided that the oscilloscopes to be manufactured included a VHF (very high frequency) component having an impedance of 1,000 ohms and a sensitivity of 3 volts per inch of deflection and the vacuum tube amplifier could not be used therein. This component had never been manufactured commercially before this contract.

On October 11, 1950, TEC wrote to CAA setting forth a résumé of the engineering problems presented in connection with the work under the contract in suit. As part of its solution to such problems, the use of a vacuum tube amplifier was suggested.

On October 20, 1950, CAA replied by letter stating that the use of a vacuum tube amplifier should be avoided, if practicable, because of certain undesirable results which were experienced from such use. This letter reads in part as follows:

"In view of these facts it is suggested that an experimental unit be constructed so that measurements may be made to determine the maximum deflection sensitivity which can be expected in practice without the use of vacuum tube amplifiers. It is requested that we be advised as soon as the information is available regarding the maximum deflection sensitivity which can be achieved for input impedances of 500 ohms and 1000 ohms.

"Please do not hesitate to advise if we may be of any assistance since we believe that rather close liaison between your company and ourselves is desirable at this stage of the contract."

Engineers employed by TEC found it difficult to produce the specification component without the use of a vacuum tube amplifier. Since this use was forbidden by the specifications, TEC, by letter, suggested certain modifications to the contract specifications, the most important of which was the lowering of the requirement of input impedance from 1,000 to 500 ohms. The letter concluded:

"There will be no modifications in contract price or time required by us for the above changes in specifications."

CAA replied by letter stating that the suggested specification modifications had been approved. The letter concluded:

"No change in contract price or time is entailed and issuance of the change order by the Procurement Branch will be your official notification of the modification of the specification requirements."

Change Order No. 1 was accordingly issued and provided:

"No change in contract time or price is involved."

Change Order No. 1 resulted in the easing of the original requirements.

By January 11, 1951, because of large scale purchases growing out of the Korean incident, TEC had difficulty in obtaining the material deliveries. Consequently, TEC requested a defense order number (a priority) which was issued. This priority was forwarded to TEC on January 24, 1951.

On February 8, 1951, TEC's engineers brought an engineering model of the oscilloscope to the CAA in Washington. It was demonstrated and did not function properly. After two days spent in rearranging components and building aluminum shields for various circuits, TEC took the model back to its plant with the understanding that TEC would advise CAA when the oscilloscopes would be ready for testing.

On March 14, 1951, arrangements were made for testing TEC's engineering model oscilloscope at Poughkeepsie, New York. In the course of making such arrangements, TEC advised Mr. Bartholomew, CAA's project engineer, that 30 percent of the material needed for the contract in suit was on hand or under firm commitment from the supplier. TEC further advised that orders had been placed on all components and that it was preparing a letter to be sent to CAA's expediter for assistance in difficult phases of procurement.

On March 16, 1951, CAA's engineers witnessed tests of an engineering model of the oscilloscope. The engineer reported that with further corrections the model would meet specifications. TEC reported that it would freeze the design of the scope and proceed to set up production as fast as delivery of component parts would allow. CAA requested that TEC advise it of any encountered problems which would delay delivery, in order that it (CAA) might do all it could to insure deliveries of these equipments.

On April 4, 1951, a representative of TEC telephoned CAA and stated he had been spending nearly all his time expediting delivery of materials and components for the contract and that he hoped to commence production work on the following Monday. He stated that several components were still in short supply but that the first unit would probably be ready for testing within the next three weeks.

On April 6, 1951, TEC's sales engineer called CAA asking whether it would be possible to cancel the contract, stating that it was learned that contract material costs amounted to $170 per unit, whereas the contract price was $174 per unit. This request for cancellation was apparently coupled with a request for a contract renegotiation. At any rate, TEC was advised that two courses were open to it—(1) to cancel the contract for non-performance with excess costs on re-letting, or (2) performance by TEC of the contract. TEC was also told that CAA was without authority to change their contract arrangement.

On April 26, 1951, TEC informed CAA that it intended to proceed with the contract and further stated that it (TEC)

hoped to have two pre-production models ready for preliminary Government inspection sometime the following week.

On May 11, 1951, CCA wrote to TEC's president reminding him that the contractor had hoped to have two pre-production models ready for preliminary inspection sometime the first week in May but that as of that date CAA had received no information as to the status of the work or what TEC proposed to do about the contract. CAA further requested that TEC furnish it with a statement not later than May 18, 1951, setting forth the status of the work and the action proposed to be taken by TEC.

TEC, by its president, replied stating that it hoped to have two pre-production models ready for Government inspection by June 1, 1951 and that it had procured components and materials for the production run of the oscilloscopes. TEC further stated that a large part of the materials were on hand. TEC again advised of a number of problems which it had previously outlined (that it required a higher contract price) and requested that if CAA "has not the power to solve these problems that the matter be taken up with the Department of Commerce."

No pre-production models were ready for Government inspection by June 1 and accordingly on June 12, 1951, TEC was advised in a letter from CAA in part as follows:

"As you are aware delivery of the initial unit under this contract was due December 4, 1950. We have subsequently been informed of certain delays in the production of the prototype, but your letter of May 14, 1951, indicated that two pre-production models would be ready for inspection on June 1, 1951.

"Our needs are such that we cannot allow further delays in the production of this equipment. Accordingly, you are hereby notified that, unless these pre-production models are completed and ready for inspection on or before June 20, 1951, and unless we are simultaneously furnished with positive evidence of your ability to furnish the production quantities at the rate set forth in the contract, your right to proceed will be terminated. In the event of such termination, your liability for any excess costs occasioned the Government by the purchase of this equipment from another source will be determined in accordance with the terms of the contract."

The oscilloscopes were urgently needed by CAA and because of the protracted delays in production and the difficulty of obtaining materials, CAA representatives became concerned as to TEC's ability to complete the contract or the ability of CAA to place an order with some other firm in the event of TEC's default. Because of this concern, a CAA representative contacted a Washington representative of the Allen B. DuMont Laboratories, Inc. to ascertain whether DuMont was in a position to manufacture approximately 600 oscilloscopes if an order should be placed with them, and the price which DuMont would charge the Government.

On June 13, 1951, CAA was advised by letter that two pre-production models would be completed for inspection and tests on June 20, 1951. TEC again stated that it was desirable that the contract be renegotiated.

Arrangements were made for inspection at TEC's plant on June 20, 1951 of the two pre-production models. Again TEC was advised that CAA was without authority to renegotiate the contract price upward. CAA then requested that if production depended upon an increased contract price, that CAA be notified immediately.

On June 20, 1951, Mr. Chester S. Bartholomew, CAA project engineer, went to the TEC plant and observed certain tests on one oscilloscope. Two other units were estimated by him to be about 50 percent complete. The tests conducted were in the nature of spot checks on specification requirements. The test equipment at TEC's plant did not permit the full range of tests for a deter-

mination as to whether the initial unit did or did not meet all contract specifications. Bartholomew reported to the contracting officer however that the unit did substantially comply with the specifications.

On the following day, June 21, 1951, the contracting officer, along with Bartholomew and his superior, Mr. Clark, conferred at TEC's plant with Mr. John B. Milliken, President. The latter informed the group that production could not commence because of the financial condition of TEC. He again requested an increase in the contract price and was told that that could not be accomplished. He said that TEC was then in the process of clearing with the Securities and Exchange Commission an issue of debentures and that TEC should know in two weeks whether it would obtain sufficient capital to continue operations. Milliken was told that CAA would advise him early that week that CAA would either:

1. Allow him not more than 30 days to set up production and furnish a fixed number of units, or

2. Declare his firm in default and terminate its right to proceed.

On June 27, 1951, CAA terminated TEC's right to proceed and the termination notice stated:

"In view of the fact that the contract time on the subject contract has expired and the further fact that you are unable to furnish evidence of your ability to proceed with the production of the oscilloscopes, your right to proceed further is hereby terminated.

"The Government will proceed to obtain these units from other sources and your liabilities will be determined under the provisions of Article 5 of the contract."

At that time TEC was in default in delivery under the contract because it had not delivered an initial unit by June 27, 1951, which had been fully tested and found to comply with the specifications.

Thereafter, TEC made efforts to have CAA reconsider its termination, but CAA never withdrew such decision.

TEC appealed and asked for a hearing, which request was denied. (Defendant does not contend that the action of the head of the department upholding the contracting officer is final and conclusive.)

■ In this posture of the case the only question involved is whether the termination by the Government was justified.

In this connection plaintiff argues that it was not in default because the Government had waived the requirements of the initial contract with regard to delivery dates, and that the Government was obliged to give TEC notice fixing a reasonable time within which to make delivery.

The defendant concedes and agrees that the Government waived the time for making delivery of the initial units. However, the defendant says that TEC had such a reasonable time and more.

From the facts in this case we agree with the defendant. After much discussion over contract price, after seeking renegotiation, and after seeking cancellation, plaintiff finally promised two pre-production models ready for inspection by June 15. Plaintiff failed to make good on this promise and on June 12, 1951, defendant insisted that unless the pre-production models were completed and ready for inspection on or before June 20, 1951, and that TEC furnish evidence of ability to produce under the contract, its right to proceed would be terminated. Inasmuch as the oscilloscopes were urgently needed by the CAA, this it seems to the court was a perfectly normal and reasonable request.

At this juncture plaintiff again made a promise—to have the two pre-production models ready for testing on June 20. Again plaintiff failed in its promise. On June 20, 1951, only one pre-production model was completed, and at that time it was learned that certain important materials were not only not on hand but

subject to indefinite delivery delays. Furthermore on the following day, June 21, 1951, TEC's president informed the CAA that because of financial difficulties production could not commence.

Thus on June 27, 1951, the CAA sent to plaintiff a termination notice because of default in deliveries under the contract.

We can find no unreasonableness on the part of the defendant. Beyond question TEC was in default, and through no responsibility of the defendant. As a matter of fact, TEC was given every opportunity to perform under the contract and failed so to do.

Therefore, under the facts of this case, we can do nothing but uphold the Government's termination of the contract.

██ Having found that the defendant was within its rights in terminating the contract, the question then arises as to the defendant's right to recover on its counterclaim.

The facts with respect to said counterclaim are these: Article 5 of the contract provides in part as follows:

> " * * * If the contractor refuses or fails to make deliveries of the materials or supplies within the time specified in Article 1, or any extension thereof, the Government may by written notice terminate the right of the contractor to proceed with deliveries or such part or parts thereof as to which there has been delay. In such event, the Government may purchase similar materials or supplies in the open market or secure the manufacture and delivery of the materials and supplies by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned the Government thereby: * * * "

CAA relet the contract after obtaining bids from all original bidders except one. The excepted original bidder, having another contract with the CAA, was at the time experiencing technical difficulties in production. It was for this reason that that company was not invited to submit a proposal. Again we can find nothing unreasonable or illegal in this respect.

At any rate, finally a replacement contract was entered into with Allen B. DuMont Laboratories, Inc. to furnish the 606 VHF cathode ray oscilloscopes under the same specifications as the contract in suit. This reletting resulted in a total excess cost of $63,502.74.

Plaintiff claims certain impropriety in letting the replacement contract. First, plaintiff says the second low original bidder was not solicited to bid on the replacement contract. In this respect, as we pointed out earlier, this bidder was then having difficulty under another contract with the CAA and the Government properly excluded that company. Secondly, plaintiff seems to say that the action of the CAA in contacting DuMont before the termination spells out some sort of conspiracy on the part of CAA to get the business in the hands of DuMont. We can find absolutely no merit in this contention. Since CAA was extremely anxious and needed to have early and prompt delivery of the oscilloscopes, and since it was at least becoming apparent that TEC would either default or suffer cancellation of the contract because of financial reasons, it was natural that inquiry would be made at other sources of supply. We can see nothing in this action on the part of CAA which would lead us to the belief that CAA was guilty of any act of impropriety.

Under Article 5 of the contract the Government had the right to relet and plaintiff is liable for the excess costs.

Accordingly, defendant is entitled to recover on its counterclaim the sum of $63,502.74, without interest, and judgment will be entered to that effect. Plaintiff's petition is dismissed.

BARKSDALE, District Judge, sitting by designation, JONES, Chief Judge, and MADDEN and WHITAKER, Judges, concur.