**EAGLE AVIATION, INC.**

v.

**The UNITED STATES.**

**No. 529–84C.**

United States Claims Court.

Nov. 5, 1985.

Richard H. Ebbott, Flint, Michigan, for plaintiff. Morrissey Bove & Ebbott, of counsel.

Richard W. Oehler, Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C., for defendant. Donna S. Eisen, U.S. Postal Service, Washington, D.C., of counsel.

### OPINION

LYDON, Judge:

This contract case comes before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. The initial question presented to the court is whether there existed a contract between defendant and plaintiff. If this question is answered in the affirmative, then the follow-on issues of the propriety of the default termination of the contract by defendant and the resulting excess costs assessment associated with reprocurement thereof must be addressed by the court. For reasons that follow, defendant's motion for summary judgment is granted.

#### A. *Contract Formation*

Plaintiff's basic position is that the parties never entered into a viable contract. On review of the pertinent documents, the court concludes that a contract was entered into by the parties.

On February 18, 1983, the United States Postal Service (Postal Service) issued Solicitation No. 503–01–83 (Request For Proposals (RFP)) requesting bids for a contract to transport mail by Air Taxi Mail Service between Alliance and Omaha, Nebraska, with stop-overs at North Platte and Grand Island, Nebraska (Air Taxi contract). The RFP stated that bids would be opened on April 1, 1983, and that a contract would be awarded for the term beginning on May 14, 1983 and ending on June 30, 1985 (25½ months). The RFP also advised that the contract would be administered by the Transportation Management Office (TMO) of the Postal Service in Des Moines, Iowa. The contracting officer was the Manager of the TMO.

The specifications, included in the RFP, stated that the contractor would be required to provide two multi-engine aircraft capable of carrying 2,000 pounds of mail on the specified route and schedule set forth therein. The RFP also contained a section entitled "Taxi Contract Information And Instructions" which provided, under Part II, B. Award of Contract, in pertinent part as follows:

1. All contracts shall be in the name of the U.S. Postal Service and must be awarded to the bidder submitting the lowest responsible, responsive bid or to the offeror whose proposal is most advantageous to the Postal Service.

   \*  \*  \*  \*  \*  \*

3. The lowest responsible, responsive bid or the proposal selected as the most advantageous shall become the contract form. When it is accepted and signed by the contracting officer, it shall be recognized as the contract for the specified service at the rate stated therein.

The Instructions also advised that bids could not be withdrawn or modified after bid opening (Part II, C. 3).

On March 25, 1985, plaintiff submitted a bid in response to the RFP. As required by the RFP, plaintiff, through its President, completed and signed, *inter alia,* "Form 7456" Cost Work Sheet and "Form 7452" Aircraft Description. On Form 7456, plaintiff, under "Aircraft," wrote in the appropriate blank spaces "Aero Commander, 560F, To Be Purchased, 120,000 ["Investment In Route"]." On Form 7452,

which plaintiff completed and signed, plaintiff stated it proposed to use: "Aircraft Make <u>Aero Commander</u>; Model <u>560F</u>; Engine Make <u>Lycoming</u>; Model <u>160540B1A</u>; Horsepower <u>350</u>; Registration Number <u>N. To Follow</u>; Serial Number <u>To Follow</u>; Airworthiness Certificate Type <u>Utility</u>; Date <u>current</u>." (Plaintiff supplied the underscored information.) On Form 7453 <u>Air Taxi Modifications</u>, plaintiff again stated the aircraft to be used to perform the contract was "To Be Purchased."

Eight bids were submitted in response to the RFP. When the bids were opened on April 1, 1983, as scheduled in the RFP, it was revealed that plaintiff was the lowest bidder. The bids ranged from a low of $1.3892 per GCM (Great Circle Mile—an air navigation measurement term) to a high of $1.88 per GCM. The second lowest bid was $1.4695 per GCM and the second highest bid was $1.795 per GCM. The third to sixth lowest bids were in the $1.5 per GCM range.

By letter dated April 4, 1983, the contracting officer (the TMO Manager) notified plaintiff that its bid was the "lowest responsive bid." Further, the contracting officer requested, *inter alia*, certain financial information of plaintiff, and also inquired whether there might be a possible error in its bid and thus required of plaintiff a written verification of said bid price of $1.3892 per GCM.

The TMO thereafter conducted a pre-award review relative to plaintiff's ability to perform the contract. This review was conducted by the Des Moines TMO's transportation officer Robert V. Smith (Smith), who served as an assistant to the contracting officer. Smith analyzed the information and documents furnished by plaintiff, ascertained that a prior air taxi contract with the Postal Service had been satisfactorily performed, and found no indication that plaintiff would be unable to perform the work called for under the RFP. Accordingly, Smith recommended to the contracting officer that plaintiff be awarded the contract.

Under cover of a letter dated April 26, 1983, the contracting officer transmitted to plaintiff a Notice of Acceptance of plaintiff's bid re Solicitation No. 503-01-83 (RFP). This Notice advised plaintiff in pertinent part:

Your bid or proposal submitted in response to the solicitation specified above for carrying and/or handling the United States Mail in accordance with your bid or proposal is hereby accepted for the term named herein [May 14, 1983—June 30, 1985].

On that same date, April 26, 1983, the contracting officer signed Form 7405 entitled "Transportation Services Bid Or Proposal And Contract," previously signed by plaintiff's president, George Bye, on March 25, 1983. Form 7405 provided in pertinent part:

In compliance with the solicitation of the U.S. Postal Service described above, the above named bidder/offeror proposes to provide the service called for in said solicitation and, in the case of a negotiated contract, in the description of service attached hereto and made a part hereof, at the rate of compensation set out above. The bidder/offeror submitting the offer or proposal agrees with the U.S. Postal Service that if this offer or proposal is accepted, the bidder offeror will give personal or representative supervision to the performance of the service. The bidder/offeror certifies that this proposal is made in his own interest and not by him as the representative of another person or company and with full knowledge of the required conditions of service.

The solicitation and all attachments are incorporated by reference as a part of this bid or proposal.

This bid or proposal is made in good faith and with the intention to enter into contract to perform service in case the bid or proposal shall be accepted.

The letter of April 26, 1983, *supra*, also transmitted to plaintiff a copy of the signed and executed Form 7405 together with an Abstract of bids and copies of the solicitation, instructions and other Forms, which

together comprised the complete air taxi contract, No. C–3–83–2–2. As to Form 7452, Aircraft Description, which plaintiff had previously submitted to TMO on March 25, 1983 when it submitted its bid, the April 26, 1983 letter stated:

An updated Form 7452 showing actual aircraft registration number must be provided to this office prior to the beginning of service. The aircraft registration number is needed for the contract.[1]

■ The term of the contract was, as stated above, from May 14, 1983 to June 30, 1985. The first flight under the contract was scheduled for May 16, 1985. On May 13, 1985, Bye, plaintiff's president, notified Smith of TMO by telephone that plaintiff did not have and could not obtain the required aircraft and therefore would be unable to provide the requisite service. Smith informed Bye of his contractual obligation and the fact that if he defaulted on the contract the Postal Service would seek damages under the *Damages* provision (Clause 9) of the contract.[2]

■ The issuance by the Postal Service of the RFP constituted a solicitation for an offer. It was not the making of an offer that vested plaintiff with the power to create a binding agreement through acceptance. *Space Research Corp. v. United States*, 225 Ct.Cl. 721, 722 (1980). However, plaintiff's offer, in response to the RFP, and acceptance of this offer by the Postal Service did create a contract binding on the parties. *Dana Corp. v. United States*, 200 Ct.Cl. 200, 216, 470 F.2d 1032, 1042 (1972); *see also National Movers Co. v. United States*, 181 Ct.Cl. 419, 421–24, 386 F.2d 999, 1000–01 (1967).

■ Plaintiff argues that its offer was incomplete and not in accord with the RFP Form 7452, Aircraft Description, which plaintiff completed and signed, as required by the RFP, which described the aircraft plaintiff proposed to use and advised that the registrations thereof were "To Follow." Since plaintiff did not include the registration numbers of the aircraft on Form 7452, plaintiff maintains its offer was incomplete and thus could not be accepted. In essence, plaintiff argues that acquisition of acceptable aircraft by plaintiff was a condition precedent to the award of a contract, citing *Cutler-Hammer, Inc. v. United States*, 194 Ct.Cl. 788, 794–95, 441 F.2d 1179, 1182 (1971). Plaintiff, however, distorts the holding in the *Cutler-Hammer* case, and its effort to force the facts of this case into the mold of that holding is unavailing. In essence, the *Cutler-Hammer* holding merely reinforces what was said

---

1. The RFP stated that "[a] properly prepared bid consists of the following forms [including Form 7452], completed and signed where designated." Plaintiff, as indicated above, submitted a completed and signed Form 7452 on March 25, 1983 to the contracting officer.

2. The May 13, 1985 telephone conversation between Bye and Smith was the subject of a "Memo for Record" prepared by Smith, the exact substance of which was confirmed by an affidavit executed by Smith and submitted in support of defendant's motion for summary judgment. Plaintiff does not dispute the substance of the "Memo" or the affidavit, nor does it submit any counter affidavit or document. Instead, plaintiff merely states, without any case citation, that Smith's affidavit and "Memo" include self-serving facts, hearsay (the report of the phone call from Bye) and conclusions of law (the existence of a contract) and thus are not properly before the court. Plaintiff is partly mistaken in this regard. Facts set forth in affidavit form are properly before the court, and, if uncontested, which is the case here, can be accepted by the court. *See Royal Indemnity Co.*

*v. United States*, 178 Ct.Cl. 46, 51–52, 371 F.2d 462, 465 (1967). In the absence of affidavits or countering evidentiary material, which is also the case here, the court accepts as true the factual statements in defendant's affidavits. *See Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959). Summary judgment should not be denied on the mere assertions of counsel or on the basis of conclusionary pleading. Nor should such a motion be denied merely to satisfy a litigant's speculative hope of finding some evidence at a later time that might serve to save a complaint from dismissal. *See Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984); *see also Ables v. United States*, 2 Cl.Ct. 494 (1983), *aff'd*, 732 F.2d 166 (1984). Conclusions of law set forth in an affidavit, of course, are not binding on the court. It is the court's function to determine the existence of a contract. *See Dana Corp. v. United States*, 200 Ct.Cl. 200, 214, 470 F.2d 1032, 1041 (1972).

earlier in this opinion, *viz.*, that the issuance of an RFP (in the *Cutler-Hammer* case, the RFP was a regulation that provided for the submission of applications for the purchase of government silver) is not an offer and that submission of an offer (or an application in the *Cutler-Hammer* case) did not constitute a binding agreement, since acceptance of the offer (in *Cutler-Hammer* approval of the application was necessary) "was a condition precedent to the formation of any binding contract." *See id.*, 194 Ct.Cl. at 794–95, 441 F.2d at 1182. More interesting is the fact that in *Cutler-Hammer*, the application, or offer, was never accepted by the United States, whereas in the case at bar plaintiff's offer was accepted by the Postal Service, thereby creating a binding contract.

There is no definitive statement in the contract documents that ownership and registration identification of aircraft were conditions precedent to the award of a contract. *Compare D.C. Andrews & Co. v. United States*, 154 Ct.Cl. 460, 465, 292 F.2d 280, 283 (1961). There is no indication the parties intended such to be conditions precedent. There was no indication from plaintiff subsequent to receipt of notice that its offer had been accepted that said notice was ineffective because plaintiff's bid was incomplete. Plaintiff has not submitted an affidavit or any documentation manifesting its intent, conveyed to the Postal Service before termination of its control for default, that it believed its offer was defective and that ownership and/or registration of aircraft were conditions precedent to a valid contract award.[3] In its April 26, 1983, transmittal of its acceptance of plaintiff's offer, the Postal Service advised plaintiff that "[a]n updated Form 7452 showing actual aircraft registration number must be provided to this office *prior to the beginning of service.* \* \* \*" (Emphasis added.) This manifests a clear

intent that such information was not a condition precedent to award of the contract but rather a condition precedent to performance of the contract. Finally, a Postal Service publication, *Transportation of Mail by Air Taxi Operators*, (Pub. 171, TL–3, 2–28–77), applicable to the Postal Service and air taxi operators transporting mail under contract and presumably available to all bidders, provided in pertinent part:

> 242.3 When aircraft are purchased or leased for mail service after a contract has been awarded, the operator must complete Forms 7452 and 7453 and submit them to the contracting officer for evaluation and approval prior to operating the aircraft in mail service.

This provision clearly recognizes and sanctions the possibility that a party may bid on the contract while intending to purchase or lease aircraft only if it is ultimately awarded the contract. It has been said, and rightly so, that "[t]ransactions of this kind must be interpreted with common sense and in accordance with the actual usages of men." *See The Padbloc Co. v. United States*, 161 Ct.Cl. 369, 378 (1963). With this principle in mind, it is reasonable to conclude, on the above-undisputed facts, that a binding contract came into being between plaintiff and the Postal Service.

The circumstances in the case at bar are much stronger than those present in *National Movers Co. v. United States, supra,* wherein the Court of Claims found a binding contract was made. In the *National Movers Co.* case, an RFP to move uncrated, new furniture was issued by the General Services Administration (GSA) on May 28, 1964, with bids to be opened on June 3, 1964, and work to begin on June 8, 1964. On June 3, 1964, GSA notified National it was the low bidder, and requested that it furnish a copy of its current financial statement. National delivered this statement to

---

3. In plaintiff's brief, counsel advises that plaintiff will show, if defendant's motion for summary judgment is denied, "that although it contacted at least eight aircraft owners none of the aircraft fit all the requirements of the Postal Service. A request to Mr. Smith for additional

time before start up because the only aircraft that fit this job needed crew doors installed was denied." Apart from the fact there was no documentary support of these statements, they can be read to suggest a recognition that a binding contract existed between the parties.

GSA on June 4, 1964. GSA approved the financial statement and executed the contract on June 5, 1964. At about 3:00 p.m. on June 5, 1964, GSA telephoned National and informed it of the award. National, in response to said telephonic information, advised it could not perform because the award had not been made the day before, *i.e.*, June 4, 1964, and the notice of award thus came too late for plaintiff to comply with the terms and conditions of the RFP. In concluding that a binding contract was made, the Court of Claims found that GSA's notice of award was timely made and rejected plaintiff's excuse for refusal to perform based on its alleged inability to obtain workmen from the Union for June 8, 1964.[4]

■ Defendant's April 26, 1983 notice of award to plaintiff was a valid acceptance of plaintiff's March 25, 1981 offer. Accepting the fact that the April 26, 1983 acceptance letter and notice of award contemplated the execution of updated forms, or the execution of other forms, that letter and notice expressed an intent to be presently bound. As a result, the contract became effective immediately on April 26, 1983. *See Dana Corp. v. United States, supra,* 200 Ct.Cl. at 214–215, 470 F.2d at 1042; *see also Barclay v. United States,* 166 Ct.Cl. 421, 437–38, 333 F.2d 847, 857 (1964).

### B. *Default Termination*

■ As indicated earlier, the contract performance term was to begin on May 14, 1983. The first flight under the contract was scheduled for May 16, 1983. Plaintiff advised the Postal Service by telephone on May 13, 1983 that it would be unable to perform the contract because it could not locate aircraft that met Postal Service requirements in sufficient time to modify

them for the contract performance start-up date.

On May 17, 1983, the contracting officer sent a mailgram to plaintiff informing plaintiff that it had failed to perform contract service as scheduled under its contract on May 16, 1983. Plaintiff was further advised that if contract performance did not begin by May 20, 1983, the contract would be terminated for default. There is no question but that plaintiff received this mailgram. There is no indication that plaintiff ever responded to this mailgram. One would have thought that plaintiff would have raised the contention that since its offer was defective no contract came into existence at this time if it believed at that time that no binding contract existed. On June 16, 1983, the contracting officer notified plaintiff that its contract was terminated for default, effective May 17, 1983, in accordance with Clause 12 of the contract because of plaintiff's "failure to provide contracted service." Plaintiff was also informed that it would be responsible for all reprocurement costs incurred by the Postal Service because of failure to perform its contract.

There is no dispute about the fact that plaintiff never commenced performance of the contract. The Postal Service, following plaintiff's avowed inability to perform the contract, immediately began efforts to obtain emergency temporary air taxi mail service along the Alliance-Omaha, Nebraska route.

Plaintiff attacks the default termination on several grounds. First, it argues that since there was no contract there could be no termination thereof. This argument falls with the court's previous determination that there existed a binding contract between plaintiff and the Postal Service. Second, plaintiff contends that the Postal

---

4. In this case, plaintiff, through its president, Bye, advised the Postal Service, through Smith, that it would be unable to come up with the aircraft required to perform the air taxi service contract and thus would be unable to perform the contract. In this case, as in *National Movers Co. v. United States,* 181 Ct.Cl. 419, 424, 386 F.2d 999, 1001 (1967), it was the responsibility of

plaintiff to supply the aircraft as it was National's responsibility to supply the workmen. Implicit in the bids submitted by plaintiff in this case, and by National, was the promise that on award of the contract both successful bidders would provide the aircraft, and the workmen, to perform their contracts.

Service knew on May 13, 1983 that it would be impossible for plaintiff to perform the contract, which date was before contract performance began. Plaintiff in its brief fails to show how this fact, assuming it to be true, affects the propriety of the default termination. The failure of plaintiff to obtain aircraft does not preclude a default termination. Indeed, it justifies such an action. *See National Movers Co. v. United States, supra,* 181 Ct.Cl. at 424–25, 386 F.2d at 1001–02; *see also Cascade Pacific International v. United States,* 773 F.2d 287, 293 (Fed.Cir.1985).

The default termination of plaintiff's contract in this case was clearly justified. *See Kennedy v. United States,* 164 Ct.Cl. 507, 513–15 (1964). The court can find no unreasonableness on the part of the Postal Service in terminating plaintiff's contract for default. *See Zoda v. United States,* 148 Ct.Cl. 49, 56, 180 F.Supp. 419, 423–24 (1960).

### C. *Excess Reprocurement Costs*

After being advised by plaintiff that it could not perform the air taxi mail service contract, the Postal Service promptly took steps to obtain emergency, temporary service. It first contacted the carrier contractor that plaintiff was to replace, Combs Freight Air (Combs).[5] Combs advised it would not enter into an emergency contract, nor did it want an extension of its current contract, which was scheduled to expire on May 15, 1983. It is noted that Combs was a bidder on the contract awarded plaintiff. Combs' bid was $1.795 per GCM, the 7th highest bid.

The Postal Service thereafter contacted the second (Omaha Aviation, Inc. (Omaha)) and third (American Central Airlines, Inc. (ACA)) low bidders on the contract awarded plaintiff. Omaha's bid offer was $1.5300 per GCM and ACA's was $1.5352 in response to the Postal Service's emergency solicitation. Omaha would have been unable to obtain the necessary equipment by the scheduled contract performance date and thus was unable to perform emergency service. The Postal Service, under the circumstances, properly did not select Omaha. *See Zoda v. United States, supra,* 148 Ct.Cl. at 57, 180 F.Supp. at 424. The Postal Service accordingly entered into an emergency contract with ACA, which was prepared to perform the contract. It is noted that ACA's bid on the emergency contract was identical to its bid on the contract awarded plaintiff.

The emergency contract with ACA was for an indefinite term, not to exceed 180 days, and was to begin on May 16, 1983. As a result of this contract, it was expected that there would be no interruption or delay in mail service on the Alliance-Omaha, Nebraska air mail service route. The ACA rate under the emergency contract was $1.5352 compared with plaintiff's rate under the terminated contract of $1.3892, an increase of about 10.5 percent. The ACA emergency contract specifications were identical in all respects to those of plaintiff's terminated contract, with two exceptions: the contract rate and duration of the contract terms were different. As to identical services, see generally *Consolidated Airborne Systems, Inc. v. United States,* 172 Ct.Cl. 588, 602, 348 F.2d 941, 947–48 (1965). The ACA contract was terminable by the Postal Service without cause and without liability upon 24-hour notice to ACA.

Problems arose with ACA's performance of its contract, causing the Postal Service to terminate said contract for default, effective May 31, 1983. The Postal Service then contacted the fourth (S.S. Airways, Inc. (Airways)) and fifth bidders (AAA Air

---

5. The air taxi mail service contract which Combs Freight Air was performing expired on May 15, 1983. Under plaintiff's contract, such air taxi mail service was scheduled to commence on May 16, 1983. Since no regularly scheduled commercial airline service met Postal Service operations needs on the air route in question, and since mail transport by truck was, because of distance, outside the time constraints of internal Postal Service operational standards, air taxi mail service between North Platte and Omaha, Nebraska was deemed the only viable means for mail transport on this route. Under the circumstances, emergency service was necessary to ensure uninterrupted and undelayed mail service on the route in question.

Enterprises, Inc. (AAA)) on the original contract relative to submission of bids for an emergency contract. The fourth lowest bidder did not make an offer. AAA, however, did make an offer to perform under an emergency contract at the rate of $1.5352. It is noted that this is the same rate at which ACA agreed to perform its emergency contract and is lower than the rate ($1.5915) AAA submitted as its bid on the terminated contract (the original contract). On June 1, 1983, the Postal Service accepted AAA's offer and entered into a second emergency contract the terms of which were identical to those of plaintiff's terminated contract except for the rate and the duration of the contract. The AAA emergency contract was for an indefinite term not to exceed 180 days and was terminable without cause by the Postal Service upon 24-hour notice to AAA.

The contracting officer, in her affidavit, stated that the rates of both temporary emergency contracts were considered reasonable under the circumstances. She noted that emergency contract rates are normally higher than regular contract rates because of the indefinite contract term. Contractors under emergency contracts usually attempt through higher rates to ensure that they will recover their start up costs before their short-term contracts expire or are terminated. The contracting officer also noted that the rates under both emergency contracts were equal to or less than the rates that these same contractors had bid in response to the original solicitation which resulted in the contract award to plaintiff.

On September 3, 1983, the Postal Service entered into a permanent replacement contract to reprocure the services that plaintiff was to have provided under its terminated contract. This air taxi service contract was with AAA and carried a rate of 1.5931 per GCM.

As a matter of internal Postal Service policy, defaulted transportation contractors are assessed only for the excess costs of reprocuring emergency contracts and are not assessed for the excess costs of procuring the permanent replacement contract.[6]

The contracting officer stated that excess costs of $8,598.78 were incurred by the Postal Service as a result of having to reprocure, through emergency contracts for the period May 16, 1983 through September 3, 1983, the services plaintiff failed to perform under its contract, which the court has found was properly terminated for default. The Postal Service did not assess plaintiff with additional administrative costs incurred by it as a result of plaintiff's default in the performance of its contract.

■ By final decision dated July 11, 1984, the contracting officer found that the total emergency contracts excess costs incurred by the Postal Service from May 14, 1983 until regular (permanent) contract service was implemented on September 3, 1983 were $8,598.78. This amount was reached by subtracting the costs for service that would have been incurred had plaintiff performed its contract during the pertinent period ($81,823.88) from the reasonable costs that were incurred during the relevant period under the emergency contracts ($90,422.66). This is a proper measure of damages. *Cascade Pacific International v. United States, supra,* 773 F.2d at 293. The decision further advised that the Postal Service had recovered $4,956.24 from amounts otherwise due plaintiff on another contract (C–5–79–1–4) it had performed for the Postal Services and applied said amount in reduction of the $8,598.78 due the Postal Service. Parenthetically, it should be noted that on June 16, 1983, the contracting officer had notified plaintiff that said deductions from contract C–5–79–1–4 would be made to offset the costs being incurred by the Postal Service because of plaintiff's default. The contracting officer in her decision of July 11, 1984

---

6. The contracting officer, in her affidavit, computed the excess reprocurement costs resulting from the permanent contract with AAA to be $63,125 over the remaining 1⅔ years of the term of plaintiff's defaulted contract.

requested payment from plaintiff of the remaining sum of $3,642.54. Plaintiff has not paid this sum as requested in this final decision.

Plaintiff filed its complaint in this court on November 13, 1984 seeking recovery of the $4,956.24 withheld from it on contract C–5–79–1–4, on the ground that said withholding was improper. In its answer to the complaint, defendant, *inter alia,* pleaded a counterclaim alleging that plaintiff was liable to defendant for $8,598.78 representing the excess reprocurement costs defendant incurred because of the proper default termination of plaintiff's Postal Service air taxi service contract. Defendant, in its answer, admitted that it had recovered $4,956.24, otherwise due plaintiff under another Postal Service contract, and had offset this amount against the $8,598.78 due defendant from plaintiff. As a result, defendant contends, in its counterclaim, that $3,642.54 remains due and owing defendant and seeks an affirmative judgment in this amount. Plaintiff's answer to defendant's counterclaim contested defendant's right to recover on its counterclaim.

As indicated earlier, the affidavits of the contracting officer and her assistant set forth the facts leading up to the assessment of excess reprocurement costs against plaintiff. In her affidavit the contracting officer states that the $8,598.78 assessment was reasonable and explains why this is so, as indicated previously. The services procured were identical to those required by the terminated contract; the Postal Service actually incurred the excess costs; and the Postal Service acted reasonably to minimize the excess costs resulting

from the default. *See Cascade Pacific International v. United States, supra,* 773 F.2d at 293. Plaintiff has filed no counter affidavit or other documentation refuting or contesting the affidavits submitted by defendant regarding the reprocurement efforts of the Postal Service and the excess reprocurement costs assessed against plaintiff. It has been noted that it is perilous for a party opposing a motion for summary judgment not to proffer any countering evidentiary materials or file counter affidavits. *See Adickes v. Kress & Co.,* 398 U.S. 144, 159–61, 90 S.Ct. 1598, 1609–10, 26 L.Ed.2d 142 (1970).

In its brief, plaintiff's counsel, in essence, challenges the Postal Service's reprocurement process. Plaintiff seems to argue that the Postal Service should have entered into a regular contract instead of emergency contracts. Had it done so, plaintiff, under Postal Service policy, would not have been subject to any excess reprocurement cost assessment. Plaintiff, in support of this contention, argues the Postal Service knew on and before April 26, 1983, when the notice of acceptance was mailed, that plaintiff could not perform the service.[7] Thus, plaintiff argues, the Postal Service should have been making other provisions for a regular contract with another contractor rather than waiting until three days after the start-up date of May 17, 1983 to terminate the contract and then provide service under an emergency contract beginning May 20, 1983. Plaintiff claims that substantial damages were caused by the Postal Service's own actions. Such a position is clearly lacking in merit.[8]

---

7. Presumably, plaintiff believes that plaintiff's notation on forms it executed that the aircraft it was to use to perform the contract it was bidding on were "To be purchased" meant plaintiff was not going to be able to perform the contract. It is unreasonable to read such notations as evidencing an inability to perform. There is simply no basis for such a view, and one cannot infer such from the materials at hand.

8. Plaintiff was given notice of contract award on April 26, 1983. Service under this contract

was to commence on May 16, 1983—the old contract was to expire on May 15, 1983. The record indicates that Bye, plaintiff's president, advised Smith of the Postal Service by telephone on May 13, 1983 that plaintiff would be unable to perform the contract. This short notice by plaintiff created the emergency situation, not Postal Service actions. It should also be noted that the Postal Service gave plaintiff a reasonable opportunity to correct its non-performance after May 16, 1983. Plaintiff failed to do anything.

Other positions advanced by plaintiff are likewise deemed without merit.[9]

 The contracting officer is vested with broad discretion in reprocurement action. In judging the propriety of such actions, the test is generally one of reasonableness under the circumstances. *See H & H Manufacturing Co. v. United States,* 168 Ct.Cl. 873, 883–84 (1964). The factual recitation, *supra,* supported by affidavits and other documentation, discloses reasonable actions by the Postal Service relative to the reprocurement problems created by plaintiff's default in contract performance. Plaintiff's efforts to point the finger at the Postal Service rather than at itself for the reprocurement situation is understandable but not persuasive.

The Postal Service's assessment of excess reprocurement costs of $8,528.78 is deemed reasonable, appropriate and proper under the existing circumstances. *See National Movers Co. v. United States, supra,* 181 Ct.Cl. at 424–25, 386 F.2d at 1001–02.

### Conclusion

On the basis of the above discussion, and without oral argument, it is concluded that there was a binding contract between plaintiff and the Postal Service; that plaintiff's failure to enter into performance of said contract justified the default termination thereof; and that the Postal Service incurred excess reprocurement costs of $8,598.78 because of plaintiff's default. It is further concluded that defendant is entitled to recover on its counterclaim of $8,598.78.

Since defendant has already collected $4,956.24 from plaintiff and applied it toward the $8,598.78 debt due defendant from plaintiff, defendant is entitled to recover herein the difference of $3,642.54. It is therefore ordered that judgment be entered for defendant, on its counterclaim, in the amount of $3,642.54, with plaintiff's complaint to be dismissed. It is further ordered that costs are not to be assessed in this case.

---

9. In finding fault with the reprocurement process, *e.g.,* problems with the first emergency contractor, and use of a second emergency contract, plaintiff ignores the fact that its action in bidding on a contract when, as it seems to imply, it was unprepared to perform said contract and then advising some 3 days before performance that it could not and would not perform created the circumstances that necessitated the use of emergency contracts. It is presumed that Postal Service officials properly performed their duties in seeing to it that mail service was continuous and undelayed by means of emergency service contracts until a regular mail taxi service contract could be achieved. *See Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 746, 572 F.2d 786, 805 (1978). The presumption that the use of emergency contracts was proper and not utilized to "run up damages" on plaintiff stands unrebutted. Plaintiff, and properly so, does not contend that the Postal Service was required to resort to the competitive bidding procedures relative to the reprocurement process. *See Consolidated Airborne Systems, Inc. v. United States, supra,* 172 Ct.Cl. at 598–99, 348 F.2d at 947; *H & H Manufacturing Co. v. United States,* 168 Ct.Cl. 873, 883 (1964).